IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INTERNATIONAL AIR RESPONSE,<br>22000 South Price Road<br>Chandler, Arizona 85248,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 00-428C<br><br>(Assigned to the Honorable Christine O.C. Miller) |

**PLAINTIFF'S CONTENTIONS OF FACTS AND LAW**

Pursuant to Appendix A ¶¶ 14(A), 15 and 16, Plaintiff International Air Response (IAR) provides the following contentions of facts and law.

## I. Facts Plaintiff Expects to Prove

There are several reported opinions that set forth the primary events underlying this case. *See, e.g., International Air Response v. United States*, 302 F.3d 1363, 1365-66 (Fed. Cir. 2002); *Aero Union Corp. v. United States*, 47 Fed. Cl. 677, 681 (2000); *Pacific Harbor Capital, Inc. v. Dep't of Agric*., 845 F. Supp. 1, 2-3 (D.D.C. 1993).

At trial, IAR expects to prove the following facts:

(1) IAR is a small air tanker company based in Chandler, Arizona, which specializes in providing aerial support for firefighting. It is the successor to T&G Aviation, Inc. IAR's principal is Woody Grantham. For convenience, this memorandum refers to both IAR and its predecessor as IAR.

(2) In 1989, Grantham heard that some of IAR's competitors were obtaining surplus C-130A and P3-A aircraft from the Forest Service through a program in which the contractors would exchange historic aircraft with the Forest Service for the C-130As

or P-3As. The historic aircraft would be displayed in USFS-sponsored airplane museums around the country. The primary intent of the program, as Grantham understood it, was to transfer largely defunct government aircraft, but which could be fitted to fight fires, into the hands of firefighting companies, while at the same time improving the specimens at USFS aircraft museums.

(3) When Grantham inquired about whether IAR could participate in the program, he was told that would not be possible, because the Forest Service had no more surplus aircraft to exchange. Unhappy with this perceived inequity in how the Forest Service was treating IAR vis-à-vis its competitors, Grantham contacted members of Arizona's congressional delegation as well as, he believes, Alaskan Senator Ted Stevens.

(4) Eventually, the Forest Service contacted Grantham and told him that it had three C-130As it could exchange with IAR, if IAR had acceptable historic aircraft to exchange. The Forest Service and IAR worked out a contract titled as an Exchange Agreement, under which IAR would receive three C-130A aircraft in exchange for three historic aircraft then owned by IAR.

(5) As required by the Exchange Agreement, which was dated September 27, 1989, IAR restored its aircraft and delivered them to three different museums as directed by the Forest Service. The Forest Service, in turn, directed IAR to an airfield in Marana, Arizona in order to pick up the C-130As.

(6) IAR later purchased two additional C-130As from a Roy Reagan, who had obtained two C-130A aircraft from IAR's competitors in exchange for his help brokering their exchange agreements with the Government.

(7) Beginning in 1991, certain competitors of IAR and the other air tanker companies that received planes began complaining about the exchange program to the Forest Service and to their congressional representatives. This prompted a Government investigation into the exchange program. In 1992, a Government OIG report concluded that the Forest Service lacked authority under applicable surplus property regulations to

enter into the exchange agreements. Notwithstanding this conclusion, however, the Government appeared to recognize that the fault was its own and did not demand return of the planes from IAR or, to IAR's knowledge, from any of the other air tanker companies.

(8) In 1994, a purported whistleblower named Gary Eitel filed suit against IAR and the other air tanker companies which received planes, alleging fraud and illegality. His suit was dismissed, 898 F. Supp. 734, but while on appeal the Government sought and received permission to intervene against some, though not all, of the defendants. IAR was not one of the defendants against which the Government sought permission to intervene.

(9) On remand, the Government sought to file an amended complaint to, among other things, include a single claim against IAR for unjust enrichment. The amended complaint did not allege IAR did anything knowingly or intentionally wrong, but simply that IAR had received substantially more value than it had provided in the transaction and that it thus would be unjust for IAR to retain the planes.

(10) IAR sought summary judgment on the Government's amended complaint against it. After briefing concluded on IAR's motion, the Government, in December 1998, abruptly issued a Contracting Officer's Final Decision, which concluded that the Government lacked authority to enter into the Exchange Agreement in 1989 and, therefore, the transaction between IAR and the Government was void.

(11) The federal court in Tucson dismissed the unjust enrichment claim on statute of limitations grounds.

(12) IAR subsequently appealed the Contracting Officer's decision to this Court, explaining that, absent wrongdoing by IAR which had not been alleged, the Government was not free simply to unwind the transaction a decade later.

## II. Factual and Legal Issues for the Court to Resolve

The factual and legal issues to be resolved by the Court include:

(1) Whether the Exchange Agreement is conclusive evidence against the Government, under 40 U.S.C. § 544, sufficient to estop the Government from seeking to unwind the transaction based on its alleged lack of authority in entering into it.

(2) Whether the Espionage Act is applicable and if so, sufficient to override 40 U.S.C. § 544 and thus require the unwinding of the transaction.

(3) If the Government is correct and the transaction must be unwound, must the Government pay IAR the out-of-pocket expenses it incurred in reliance on the transaction and, if so, what is the amount of those expenses.

(4) Is the Government's claim barred in whole or in part by laches or applicable statutes of limitation.

(5) Is IAR entitled to an award of attorneys' fees and costs under the EAJA or otherwise.

**III. Legal Principles**

The following are the legal principles that IAR believes require a verdict in its favor:

(1) The <u>only</u> ground identified in the Contracting Officer's decision as a basis for now voiding the transaction is the contention that the "FS ha[d] no authority to enter into this [Exchange] agreement." Elsewhere, the Government has clarified this contention somewhat by claiming that the exchanges violated various regulations in place at the time because (1) the C-130As arguably are not historic to the Forest Service and thus cannot be exchanged by the Forest Service; (2) the Forest Service acquired the exchanged planes, apparently, from the Department of Defense and did not use them for a year prior to exchanging them; and (3) the Forest Service obtained the planes to exchange them, as opposed to obtaining them for its own use.

(2) It is a longstanding rule of law that, if the Government fails to follow its own surplus property regulations when exchanging property with a citizen, that is the Government's problem – not the citizen's. Absent extraordinary facts, such as if the

citizen had notice of the illegality of the exchange or compelling national security concerns, a transaction will not be set aside simply because a transaction may have been unauthorized due to the Government failing to comply with the often archaic and complex rules governing surplus property. This rule of law is set forth expressly in 40 U.S.C. § 544 (formerly codified at 40 U.S.C. § 484(d)),[1] which states:

> A[n] . . . instrument executed by or on behalf of an executive agency purporting to transfer title . . . in surplus property under this chapter is **conclusive evidence of compliance** with this chapter concerning title . . . of any bona fide grantee . . . for value and without notice of lack of compliance.

40 U.S.C. § 544 (emphasis added).

(3) There is no doubt the planes exchanged were surplus property; the GSA has declared that to be expressly so. *See Pacific Harbor*, 845 F. Supp. at 2-3 (noting that the GSA had "determined the planes [the C-130As] to be surplus property"). And the Exchange Agreements state on their face that the exchange is "made under authority of GSA Regulation 101-46.203."

(4) The various arguments the Government has made as to why 40 U.S.C. § 544 is inapplicable are all without merit.

(5) First, the Government has suggested at various times that planes it provided in the exchange, the C-130As, are (or were) worth far more than the planes IAR provided. As an initial matter, whatever accuracy that claim ever had, it has none now, as the market for C-130As is now virtually nil, the Forest Service does not allow the planes to be flown on its behalf any longer due to safety concerns, and the Air Force also no longer flies the planes. But, in any event, it is **irrelevant** to the inquiry whether the value exchanged was roughly equivalent or not. *See, e.g., United States v. Jones*, 176 F.2d 278, 286-90 (9th Cir. 1949) (explaining that the purpose of government surplus property

---

[1] Title 40 was renumbered and slightly amended in 2002 without any substantive change intended. H.R. Rep. No. 107-479, at 1 (2002), *reprinted in* 2002 U.S.C.C.A.N. 827, 827.

transactions is not necessarily to gain a profit but to put surplus assets in the hands of citizens who may be able to put them to better use). This is true even if the citizen knew that the property it was receiving from the Government was worth more than the citizen was being asked to pay. *Id.*

(6) Second, although it is not clear whether the Government still takes this position, in the past it has claimed that 40 U.S.C. § 544 does not protect those who deal directly with the Government but instead only protects those who subsequently receive the property through transactions with the citizen who initially acquired the property. This Court appeared to reject this position when the Government took it in *Aero Union v. United States*, 47 Fed. Cl. at 685. In any event, the argument also was rejected in *Pacific Harbor*, 845 F. Supp. at 3, *Jones*, 149 F.2d at 289-90, and *United States v. Mailet*, 294 F. Supp. 761, 755-66 (D. Mass 1968).

(7) Third, the Government may take the position that somehow IAR was not a bona fide grantee because it somehow had "notice of lack of compliance" by the Government. To date, zero evidence has been produced to support any such theory. Grantham did not use a lawyer to investigate, negotiate, or document the transaction with the Forest Service. There is no evidence that he was aware that the Forest Service was not complying with government surplus regulations. Grantham is an Arizona-based pilot and rancher. Notably, the Government has litigated with many other participants in this program and alleged that some of them knew or had good cause to know that the transaction was illegal, but has not made such allegations against IAR.

(8) There is authority for the proposition that, if the Espionage Act applies (because retention of the Government property threatened national security and otherwise met the elements of the Espionage Act), then the transaction must be unwound notwithstanding 40 U.S.C. § 544. *See Dubin v. United States*, 363 F.2d 938 (Ct. Cl. 1966). The Government more recently has claimed that the Espionage Act is applicable here and provides a basis for the relief it seeks.

(9) IAR respectfully submits that the invocation of the Espionage Act is seriously improper and pretextual. Disciplinary Rule 7-105 of the Lawyer's Code of Professional Responsibility states that "a lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." MODEL CODE OF PROF. RESPONSIBILITY DR 7-105 (1984). That the Government's eleventh-hour invocation of the Espionage Act here is pretextual is clear, for numerous reasons.

(10) Obviously national security is not legitimately the issue since the Government has allowed other contractors that received planes to keep them if the contractors paid an acceptable settlement figure to the Government. If the planes are a national security threat being in the hands of private contractors, then surely they do not become less of a threat simply because the Government receives a payment.

(11) The planes at issue were produced in the 1950s, are flown privately and by governments in over 60 other countries, and are no longer even flown by the United States Air Force.

(12) The Government received its own OIG report in 1992, which reported on an investigation into the transactions and concluded that the exchanges were likely unauthorized. Yet, the Government did not take any action even to demand return of the planes until 1998 – a demand that was soon after and repeatedly couched by offers for IAR to keep the planes if it paid new money to the Government.

(13) The statute of limitations on any Espionage Act claim has long run. It is a long statute: ten years. *See* Act of Sept. 23, 1950, c. 1024, § 19, 64 Stat. 1005 (cited in 18 U.S.C.A. § 792 Historical and Statutory notes). Even so, the Government waited easily more than ten years even to make informal demand for return of the planes under the Espionage Act, and any claim based directly or indirectly under the Act is thus time-barred.

(14) Furthermore, the statute on its face appears inapplicable. No case has ever, in the long history of the Espionage Act (which dates to 1917), suggested that anything like an air tanker falls within the scope of the Act. The Act's language, applying to "any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note [or other "information"] relating to the national defense" would not appear to apply to an air tanker. Rather, the Act is understandably aimed at protecting sensitive information or the technology within certain devices – not an entire air tanker that has been in both public and private use for decades.

(15) Courts have applied § 793(d) to radar transmitters and receivers, *Dubin*, 363 F.2d at 939, guidance sets for ballistic missiles, *AST/Servo Systems, Inc. v. United States*, 449 U.S. 789 (Ct. Cl. 1971), and "devices," *In re Williams*, 1992 WL 55402, at *1 (Comp. Gen. July 24, 1992). Given that "every part . . . of the national economy and everything tending to disclose the national mind are important in time of war and will relate to the national defense, *United States v. Heine*, 151 F.2d 813, 815-16 (2d Cir. 1945) courts have limited their application of the Act to information the government has made an effort to guard closely. *Id.* (Hand, J., finding that information about airplanes accessible to anyone willing to make the effort to find, sift and collate it from lawfully available sources could not support a conviction under the Act). No court has ever held, implied or otherwise suggested that a C-130A could be viewed as a classified, sensitive, or containing information pertinent to the national defense.

(16) Indeed, courts assessing the "relation to the national defense" standard also consider whether the information at issue would be potentially damaging to the United States or useful to a United States enemy. *See, e.g.*, *Dubin*, 363 F.2d at 941-43; *United States v. Morrison*, 844 F.2d 1057, 1071 (4th Cir. 1988). Given how old the planes in IAR's possession are and how widely available they are throughout the world, the technology they contain is too outdated and too widespread to deliver information that

could actually hurt the United States. IAR does not believe the Government will be able to present a case that IAR's possession of the planes presents a threat in relation to the national defense.

(17) Even assuming the Espionage Act applies, the Government is not entitled merely to demand a re-exchange of the planes without compensating IAR for its out-of-pocket expenditures incurred as a result of its good faith participation in and reliance upon the transaction. When repossessing goods under the authority of the Espionage Act, after mistakenly selling the property, the Government must reimburse the purchaser for his direct out-of-pocket costs. AST/Servo, 449 F.2d at 792; Dubin, 363 F.2d at 943 (Davis, J., concurring); Williams, 1992 WL 194742, at *1. Direct out-of-pocket costs consist of money or efforts spent as a direct consequence of the failure of the contract. *See Laka Tool and Stamping Co.*, 650 F.2d 270, 271-72 (Ct. Cl. 1981) (out-of-pocket costs were losses in the form of expenditures for efforts wasted because of impossible specifications in a government contract). The court in the *Dubin* case acknowledged the "urgent equity" in reimbursing a citizen for its out-of-pocket costs in a case in which the transaction had to be unwound due to the Government's mistake in contracting. 289 F.2d 651, 655 (Cl. Ct. 1961).

(18) The Government knew and expected that IAR would be acquiring the planes in order to retrofit them to fight fires. In doing so, IAR spent over $2 million on the planes it received form the Government. IAR has provided proof of these expenditures to the Government and will, if necessary, present them at trial.

(19) Even when a transaction is unwound because the underlying contract is deemed void *ab initio*, the Government is not entitled to monetary damages. *See, e.g., United States v. Amdahl*, 786 F.2d 387, 393 (Fed. Cir. 1986); *Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers,* 577 N.E.2d 283, 293 (Mass. 1991). Rather, the Court would have discretion to fashion an equitable remedy to ensure neither party's

rights are unfairly trampled. *Amdahl*, 786 F.2d at 393; *Danvers*, 577 N.E.2d at 293. The relevant equitable equation would appear to be as follows:

VALUE of AIRCRAFT IAR RECEIVED

Minus

IAR'S OUT OF POCKET EXPENSES

Minus

VALUE OF AIRCRAFT GOV'T RECEIVED

(20) The evidence will show that the value of the aircraft IAR currently possesses is far, far exceeded by the combined amount of IAR's out-of-pocket expenses and the value of the planes IAR delivered to the Government.

Respectfully submitted,

Date: November 6, 2006

By: s/ Randy Papetti
Randy Papetti
Lewis and Roca LLP
40 North Central Avenue
Phoenix, Arizona 85004-4429
602-262-5337 Telephone
602-734-3865 Facsimile
Attorney of Record for Plaintiff
International Air Response

Certificate of Filing

I certify that the foregoing Plaintiff's Contentions of Facts and Law was electronically filed this 6th day of November 2006.

s/Carole Hanger