# In the United States Court of Federal Claims

No. 00-428C
(Filed March 12, 2007)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **INTERNATIONAL AIR RESPONSE,** | * | Contracts; remand; Aircraft Exchange |
| | * | Agreement with the United States Forest |
| | * | Service; authority to undertake exchange |
| Plaintiff, | * | of surplus airplanes for antique aircraft; |
| | * | *bona fide* purchaser for value, 40 U.S.C. |
| v. | * | § 544 (2000); government counterclaim |
| | * | for return of value of planes, 28 U.S.C. |
| **THE UNITED STATES,** | * | § 1503, 2508 (2000); restitution; |
| | * | Espionage Act, 18 U.S.C. § 793 (2000). |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

Randall S. Papetti, Phoenix, AZ, for plaintiff. Lewis and Roca, LLP, of counsel.

Roger A. Hipp, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

Following the completion of a one-day, two-witness trial, the court entered a summary of the ruling that it would issue as an opinion. This opinion encapsulates that ruling. This decision has long been delayed, in part, because in 2001 the court dismissed plaintiff's complaint for failing to comply with a jurisdictional filing period. On appeal plaintiff proffered a new argument, which the trial court did not have an opportunity to consider. Based on that new argument, in 2003 the United States Court of Appeals for the Federal Circuit issued its mandate reversing and remanding. Then the real aging of the case began.

## BACKGROUND 1/ AND PROCEDURAL HISTORY

International Air Response, Inc. ("plaintiff"), originally challenged a contracting officer's decision that plaintiff's 1989 Exchange Agreement (the "Agreement") with the United States Forest Service (the "Forest Service") was illegal. The Agreement called for T&G Aviation, Inc., plaintiff's predecessor, to provide three historic aircraft to museums designated by the Forest Service. In exchange, plaintiff would receive three C-130A military transport airplanes, which plaintiff could modify for air tanker use.

The Agreement is but one of numerous similar exchange agreements whereby the Forest Service provided surplus military transport planes to aviation companies in return for historic aircraft. See Aero Union Corp. v. United States, 47 Fed. Cl. 677 (2000) (denying motion for summary judgment). These exchange agreements have been the subject of multiple lawsuits. An independent airplane broker and a Forest Service official responsible for most agreements, although not plaintiff's Agreement, faced criminal charges with respect to their involvement in the aircraft exchanges. See United States v. Fuchs, 218 F.3d 957 (9th Cir. 2000). The Department of Agriculture, which has authority over the Forest Service, began to scrutinize the exchange agreements in 1989. Plaintiff's Agreement was among those which the Department of Agriculture examined, although no action was taken. Some of these aviation companies, however, resorted to legal challenges against the Government's attempts to void their agreements. See Aero Union, 47 Fed. Cl. 677; Pac. Harbor Capital, Inc. v. United States Dep't of Agric., 845 F. Supp. 1 (D.D.C. 1993).

United States *ex rel.* Eitel v. Reagan, 898 F. Supp 734 (D. Or. 1995), generated the issue before the court. Eitel, a 1994 action under the False Claims Act, 31 U.S.C. § 3729 (1994), was brought against all the aviation companies, including plaintiff, involved in the Forest Service's aircraft exchange program. See id. The Government declined originally to intervene in this *qui tam* action. After the United States District Court for the District of Oregon dismissed the action and appellate briefing and argument were completed, the United States Court of Appeals for the Ninth Circuit allowed the Government to intervene. The Government intervened originally against several defendants in the Eitel action, but not plaintiff. The Ninth Circuit remanded the case to the district court, which, in turn, transferred the case to the United States District Court for the District of Arizona. Following

---

1/ The background, with minor alterations, is taken from the Facts section of the opinion granting defendant's motion to dismiss on jurisdictional grounds. See Int'l Air Response v. United States, 49 Fed. Cl. 509, 510-11 (2001), rev'd and remanded, 302 F.3d 1363 (Fed. Cir. 2002), reh'g denied, 324 F.3d 1376 (Fed. Cir. 2003).

transfer, the Government filed an amended complaint naming plaintiff as an Eitel defendant. Plaintiff responded on April 29, 1998, with a motion for summary judgment.

On November 28, 1998, while plaintiff's motion for summary judgment was pending before the Arizona federal district court, the contracting officer issued a decision: (1) finding the Agreement between the Forest Service and plaintiff illegal and (2) determining that the Government was entitled to the return of the C-130A aircraft. Plaintiff received the contracting officer's decision on or about December 8, 1998. 2/ The Contract Disputes Act, 41 U.S.C. § 609 (2000) (the "CDA"), affords plaintiff ninety days to appeal the contracting officer's decision to the appropriate Board of Contract Appeals—in this case, the Department of Agriculture Board of Contract Appeals—or one year to file a claim in the United States Court of Federal Claims. Thus, plaintiff's appeal originally was required to be filed in this court by December 8, 1999, at the latest.

On January 7, 1999, plaintiff sought a stay of the contractor's decision from the Arizona federal district court. On February 1, 1999, the district court issued an order "staying the enforcement of the action by the contracting officer and staying any deadlines pertinent to that order for appeal or review." On October 13, 1999, after plaintiff's motion for summary judgment was granted, the district court lifted the stay. That order stated:

> The Government requests that the Court lift its order enjoining the prosecution of the Government's case in the District Court of the District of Columbia.
>
> THE COURT FINDS that the issues to be raised in the District of Columbia, pursuant to the Contract Disputes Act of 1978, are different and separate from those raised in the action before this Court. Accordingly, neither res judicata nor collateral estoppel operate [*sic*] to make the injunction issued in this case, which was entered to prevent duplicitous litigation, foreclose the litigation of the issues in the District of Columbia. [*sic*]

United States v. Reagan et al., No. 97-169 (D. Ariz. Oct. 13, 1999). On July 21, 2000, plaintiff's complaint was filed in the United States Court of Federal Claims. On June 1, 2001, this court granted defendant's motion to dismiss for lack of jurisdiction and directed entry of judgment against plaintiff without prejudice. See Int'l Air Response v. United

---

2/ Defendant's certified mail receipt reflects December 7, 1998, as the date of delivery, although plaintiff states that it received the contracting officer's decision on December 8, 1998. Pl.'s Br. filed Mar. 19, 2001, at 6.

States, 49 Fed. Cl. 509 (2001) ("Int'l Air I"). The court ruled that the deadline to file an action in court prescribed by the CDA was not tolled because the Arizona federal district court lacked the authority and jurisdiction to stay the filing deadline and was not tolled by the doctrine of equitable tolling. On September 4, 2002, the Federal Circuit reversed the court's decision because the doctrine of res judicata barred the Government from challenging the Arizona federal district court's jurisdiction to enter the stay with respect to the filing period. The prevailing new argument pressed by appellant was that the issue of the district court's authority already had been litigated and decided in federal court; the Government had not sought appeal; and, as a consequence, principles of res judicata applied to jurisdictional determinations, such that defendant was foreclosed from collaterally attacking the district court's authority to enter the stay. See Int'l Air Response v. United States, 302 F.3d 1363 (Fed. Cir. 2002) ("Int'l Air II"). Interestingly, the trial court had scoured the record to assure itself that the Government was abiding by the principles of fair play with respect to the arguments that it was making. See Int'l Air I, 49 Fed. Cl. at 515 ("The court has scrutinized the Government's conduct both before the Arizona district court and the Court of Federal Claims and concludes that it does not sink to the level of whipsawing. What befell plaintiff's efforts to obtain judicial redress is regrettable, although necessary to uphold . . . larger jurisdictional principles."). Although before the undersigned appellant only challenged defendant's collateral attack on the federal district court's stay and did not discuss the consequences of failure to appeal—or cite case law dealing with that issue— as it relates to res judicata, that argument prevailed. Perhaps this was a case that warranted an exception, as plaintiff was done wrong by the Forest Service.

After the case was remanded to the trial court on April 11, 2003, the court adopted the parties' proposed schedule for further proceedings and ordered defendant to respond to the complaint by June 25, 2003. Following three enlargements of time, defendant filed its Answer and Counterclaim on August 21, 2003. Plaintiff moved on September 15, 2003, to dismiss the counterclaim and, after seven motions for enlargements of time, defendant finally responded on March 31, 2004. Plaintiff obtained two enlargements of time and filed its reply brief on May 3, 2004.

The court expressed sympathy to plaintiff's litigation plight in its May 13, 2004 order denying without prejudice plaintiff's motion to dismiss defendant's counterclaim. See Int'l Air Response v. United States, No. 00-428C (Fed. Cl. May 13, 2004) (unpubl.). The court quotes from that unpublished order:

> Plaintiff's action filed in the United States Court of Federal Claims on July 21, 2000, responded to a contracting officer's November 28, 1998 decision making a claim against plaintiff, and no other avenue was available to plaintiff to challenge this claim. See 41 U.S.C. § 605(b) (2000). In 1998 the

Government had brought plaintiff into a *qui tam* action in federal district court based on the same transactions that underlie plaintiff's appeal of the Government's counterclaim. Plaintiff's action in the Court of Federal Claims was stayed until that action had run its course. See generally [Int'l] Air Response v. United States, 49 Fed. Cl. 509 (2001), rev'd and remanded, 302 F.3d 1363 (Fed. Cir. 2002), rehr'g denied, 324 F.3d 1376 (Fed. Cir. 2003). Now that the Federal Circuit has allowed plaintiff to proceed, the Government resurrects its claim that was time-barred in federal district court as a government counterclaim, which would have the effect of permitting a large money judgment to be entered against plaintiff should plaintiff not prevail on its claim.

The court draws on the background and discussion of the proceedings in federal district court as the framework for ruling on plaintiff's instant motion. See [Int'l] Air, 49 Fed. Cl. at 510-11. The district court's order entered on October 13, 1999, expressly states that the injunction ordered to be lifted shall not have either *res judicata* or collateral estoppel effect on the proceedings in the Court of Federal Claims. However, the order does not state that the judgment on the merits that enforced the statute of limitations against the Government would not have preclusive effect in the Court of Federal Claims. Plaintiff is correct that the judgment operated on the merits. Defendant, however, resists the characterization of the judgment as being on the merits, and Doko Farms v. United States, 956 F.2d 1136, 1141-42 (Fed. Cir. 1992), is controlling authority for defendant's position. The statute of limitations is jurisdictional in actions against the United States, and a dismissal for lack of subject matter jurisdiction operates as a dismissal without prejudice, *i.e.*, it does not operate on the merits. Therefore, presumptively, a dismissal on the merits for failure to comply with a statute of limitations applicable to bringing a claim in federal district court would not bar the Government from pressing its counterclaim in the Court of Federal Claims. This is the logic (although not the expressed rationale) behind the Federal Circuit's decision in Doko Farms.

Plaintiff's motion must be denied, but the court denies it without prejudice, because the facts at trial may provide a basis for dismissal. The court also advises the Government that it will not allow any further motions practice. The Government has filed one jurisdictional motion; the court will not entertain another (issues of this nature can be briefed in connection with trial) or a dispositive motion on the merits. The resources of both the parties are better spent at this point in the speediest manner of resolving the claim and

> counterclaim, which is trial. The filings to date demonstrate the existence of genuine issues of material fact concerning the contracting officer's authority to enter the contract with plaintiff. [3/]
>
> The Government obtained most of its enlargements of time based on the need to investigate plaintiff's claim and its own counterclaim. To the extent that other matters have claimed defense counsel's attention during the pendency of plaintiff's motion to dismiss, this case has ascended to a priority No. 1 status.

Id. at 1-2.

The May 13, 2004 order scheduled trial to begin on November 15, 2004. That action proved to be ephemeral. On June 8, 2004, at the parties' request, discovery was extended, the trial date vacated, and the parties directed to propose a new trial date at a status conference scheduled for October 14, 2004. The parties avoided that date by segueing into settlement discussions. See Order entered Nov. 18, 2004. Although the court monitored the parties' progress toward settlement via periodic status reports, the parties on June 24, 2005, asked that the court order the Clerk of the Court to assign the case to a settlement judge pursuant to RCFC General Order 13. Judge Nancy B. Firestone served in that capacity, and this court monitored progress of that effort.

On December 8, 2005, the parties reported to the court that Judge Firestone had "graciously devoted a full day to working with the parties to help them negotiate a settlement," which resulted in a settlement that counsel for the parties and the Department of Agriculture would recommend for approval. See Status Report filed Dec. 8, 2005, at 1. The parties requested that this court schedule another settlement conference in 90 days, as "the case appears close to finally being resolved." Id. Well, "almost," but not by two years. Processing the settlement, again monitored by this court, dragged on through July 17, 2006, when defendant advised that an issue involving yet another agency, the Federal Aviation Administration, "may force [defendant] to conclude that the settlement proposal is not feasible." Def.'s Status Report filed July 17, 2006, at 1. Defendant's skepticism proved accurate. By order entered on July 21, 2006, trial was scheduled to begin on November 13, 2006. It was later rescheduled to November 15, 2006, during the pretrial conference held on November 9, 2006, after the parties announced a reduced time period required for trial.

---

3/ Trial did not address this issue. The contracting officer testified on the process and thinking by which he reached his decision.

Trial began and concluded on November 15, 2006. The court orally advised the parties of its decision. The court informed the parties that date that it would defer issuing a written opinion for thirty days to give the parties a final opportunity to settle the case—the result being quite one-sided. On December 18, 2006, plaintiff filed a Notice of Non-Settlement and asked that the court issue its opinion and order. However, a telephonic notification by both parties that settlement had been reached and was awaiting final approval within the Department of Justice forestalled the issuance of the opinion. See Order entered Jan. 2, 2007. Defendant and plaintiff notified the court separately on January 19, and 22, respectively, that a consummated settlement was no longer possible. Plaintiff's Response to Defendant's Status Report filed on January 22, 2007, laid the predicate for questioning the Government's *bona fides* in keeping settlement on life support and postponing issuance of the court's decision. By order of February 6, 2007, the court lifted the stay, stating that "[d]efendant's decision to reject settlement as of mid-January has compromised an expedited decision . . . ." and that "[t]he court will endeavor to issue its opinion by March 12, 2007." See Order entered Feb. 6, 2007.

**FACTS AND DISCUSSION**

Organized under the laws of Arizona, plaintiff is a small air tanker company that specializes in aerial fire fighting and, in the past, has engaged in aerial spraying for pest control. In 1989 William Woodford ("Woody") Grantham, at the time vice-president of T&G Aviation, Inc., learned that the Forest Service was providing his competitors C-130A military transport airplanes, which could be converted into air tankers, in exchange for historic aircraft. Mr. Grantham, a knowledgeable witness who impressed the court, testified about how he learned about the exchange program:

> I was in Alaska I think in the spring of 1989 fighting a fire with one of our DC-7s, and of course one of my competitors shows up, and we're down at the Greyhound Bar having a beer when everybody got off duty that evening and he said man, you know, we've got these C-130s, the Forest Service is giving us C-130s. Of course I'm amazed because the effect to my level of the industry . . . . because I could see the C-130s putting my larger air tankers out of business . . . .
>
> . . . .
>
> I immediately got upset of course . . . then the next morning I got up and I started calling my congressional support people. . . . I called Mr. Fuchs [Assistant Director for Aviation] at the U.S. Forest Service who I was told that evening over the beer that he was in charge of this deal, so I called him up. He

> told me there were no more airplanes available to trade. So then I did become more livid, you know? So then I started calling my congressman and senators and told them this story. About two days later I receive a call back from one of my congressional people and he said, Woody, I went over to the Forest Service, he says they're really nervous about something, but he says I think you might get some airplanes. That's my whole knowledge of this whole deal.

Transcript of Proceedings, Int'l Air Response v. United States, No. 00-428C, at 45-46, 50-51 (Fed. Cl. Nov. 15, 2006) ("Tr.").

Before the Forest Service began the exchange program, Mr. Grantham considered that plaintiff had an advantage over its competitors. At the time plaintiff owned eight DC-7 air tankers, more than any of its competitors. According to Mr. Grantham, the DC-7 was the only 3,000-gallon air tanker available to the Forest Service or any government agency. As a result of the exchange agreements, however, plaintiff's competitors were able to replace the smaller C-119 air tanker, a 2,000 gallon aircraft, with the C-130A airplane, which has a 3,000-gallon capacity. Unlike plaintiff, most of the other aerial fire fighting companies were invested heavily in the smaller C-119 aircraft. The result of the exchange program, from Mr. Grantham's perspective, was that plaintiff's advantage effectively was eroded. "My thoughts were at the time that the Forest Service would be inclined to use the newer, more modern C-130 and P-3 aircraft instead of using my DC-7 aircraft and I had lost a, so to speak, competitive edge or a competitive position." Tr. at 53.

After learning of the exchange program, plaintiff eventually secured three C-130A airplanes. On September 27, 1989, plaintiff entered into the Agreement with the Forest Service. The Agreement provides:

> The Forest Service will provide three C-130A aircraft to the Exchanger [plaintiff] on an as-available basis for use as firefighting air tankers, and they may only be flown in support of forest, brush, or rangeland protection:
>
> | | |
> |---|---|
> | C-130A | S/N 56-0478 |
> | C-130A | S/N 54-1631 |
> | C-130A | S/N 57-0512 |

> The Exchanger will provide to the Forest Service the following fully restored and flyable aircraft:[4/]
>
> . . . DC-7B [S/N] 44-701
> SNB5 S/N 89-468
> UH-19B S/N . . . 55-4943
>
> This exchange is made under authority of GSA Regulation 101-46.203.

DX 3.

The DC-7B, SNB5, and UH-19B had unique backgrounds that made them attractive museum pieces. The DC-7B was the first DC-7 air tanker to be commercially used, Tr. at 56, and in 1989 was still a revenue-generating asset for plaintiff. Plaintiff delivered the DC-7B aircraft to the Pima Air Museum in Tucson, Arizona. The SNB5 was a historic military aircraft. The Forest Service used it for smoke jumpers and as a spotter aircraft for many years. In addition, the aircraft held the cross-country speed record during the 1940s. Plaintiff was directed to take the aircraft to the Planes of Fame Museum in Chino, California. The final aircraft, was the UH-19B a helicopter, which the Forest Service employed as a troop mover and bucket slinging helicopter. It was a "late World War II, Korean War vintage helicopter." Tr. at 59. Plaintiff delivered the helicopter to a museum in Lancaster, California. On cross-examination, Mr. Grantham estimated the purchase price or value of each aircraft. Mr. Grantham testified that he acquired the DC-7B in 1970 or 1971, paying about $20,000.00 and investing approximately $1,000,000.00. He estimated that the DC-7B was worth approximately $1,000,000.00 at the time of the exchange. The SNB-5 was purchased for approximately $50,000.00. Mr. Grantham testified that he had acquired the UH-19B helicopter more than five years before the Forest Service exchange, estimating that it was worth approximately $375,000.00 when he delivered it to the museum in Lancaster, California.

After exchanging the aircraft, plaintiff received an Aircraft Bill of Sale ("Bill of Sale") from the United States Department of Transportation. Each Bill of Sale recited the consideration paid; the SNB5, DC-7B, or UH-19B aircraft, respectively; and the serial numbers of the respective C-130A airplanes that plaintiff was receiving in return. All three Bills of Sale were signed by Fred A. Fuchs, Assistant Director for Aviation for the Forest

4/ Handwritten changes were made to the contract to reflect the accurate model and serial numbers of the aircraft that plaintiff exchanged. Tr. at 56-57.

Service. The Bills of Sale for two of the C-130A airplanes were executed on September 27, 1989. The third Bill of Sale was executed on November 3, 1989.

In order to use the C-130As as air tankers, retro-fitting of each airplane was required. The retro-fitting process included installing avionic upgrades, completing maintenance inspections, and licensing each aircraft. Mr. Grantham testified that it took approximately ninety days to license and inspect the three planes. [Tr. 72.] The expensive and time-consuming process was necessary because, as Mr. Grantham explained,

> when we received [the C-130 air tankers] from the military they're not airworthy aircraft in the civilian world. You have to convert them over to civilian aircraft from military aircraft which is a pretty extensive inspection [process] and some modifications of the aircraft [are required] and then you have a licensing authority person . . . come and write the aircraft type certificate license on it.
>
> . . . .
>
> Well, after the licensing and inspections we probably [started installing the avionics]. . . .
>
> Avionics are aircraft radios and navigation equipment. So we had to change those over to civilian equipment and put in new equipment to do that. New radios, new avionics guidance equipment . . . .Then of course you have to have all the instruments re[-]certified, the altimeters, everything like that done. Then after that then we had to have the retardant tanks built and the systems built to put in the aircraft to make them qualified for air tankers or firefighting aircraft.

Tr. at 72-73.

Nothing in the record countermands the facts, as recited above. Plaintiff filed this action on July 21, 2000, challenging a November 27, 1998 decision by a Ronald E. Hooper, Contracting Officer for the Forest Service, which sought the return of the three C-130As. The decision states, in pertinent part:

> This exchange agreement did not comply with the requirements of the [Federal Property and Administrative Services Act, as amended] and the [Federal Property Management Regulations] for the disposal of Federal aircraft.

> Congress has provided the [Forest Service] with no independent authority to transfer these excess military aircraft under these circumstances.
>
> Accordingly, I must declare the exchange agreement void from the beginning. Being void from the beginning means that no title exchange ever occurred. The Government still owns the former military aircraft. T&G/Douglas County Aviation (now doing business as International Air Response) still possesses title to its historic aircraft. The Government hereby requests the return of its aircraft and is prepared to return your historic aircraft.

DX 14. Despite the contracting officer's determination, plaintiff contends, that 40 U.S.C. § 544 (2000), prohibits the Government from unwinding this transaction. 40 U.S.C. § 544 provides,

> A deed, bill of sale, lease, or other instrument executed by or on behalf of an executive agency purporting to transfer title or other interest in surplus property under this chapter is conclusive evidence of compliance with the provisions of this chapter concerning title or other interest of a bona fide grantee or transferee for value and without notice of lack of compliance.

Defendant argues that plaintiff does not qualify for protection under 40 U.S.C. § 544 because "it was not a bona fide tranferee for value because it knew or should have known that the Forest Service had not complied with the surplus property statutes and regulations." Def.'s Br. filed Nov. 7, 2006 at 4-5. Defendant put on one witness, Mr. Hooper, who was charged with resolving the issues surrounding the exchange program. He testified as to three matters: (1) the basis for his conclusion that the exchange between plaintiff and the Forest Service was unauthorized; (2) his general knowledge about the aircraft involved in the exchange; and (3) his personal knowledge of the exchange. He explained that the Forest Service initially took the position that it had authority to make the exchange, but that the Department of Agriculture's Office of Inspector General disagreed. Mr. Hooper "felt an obligation to write the assertion letter." Tr. at 174. It was six and one-half years after the Forest Service learned of the underlying swarmy arrangements with other parties whose transactions led to the issuance of the contracting officer's decision. Mr. Hooper never inspected the plaintiff's C-130As; he amortized the value after a 15-year period. He could not recall any particulars of valuing the DC-7B, SNB5, or UH-19B. The court observed that Mr. Hooper lacked conviction in his own testimony. The court finds that Mr. Hooper's evidence was insufficient to carry defendant's burden of proof on its counterclaim.

First, defendant contends that "the aircraft IAR provided in the exchange were not of comparable value to the C-130[A]s it received." Def.'s Br. filed Nov. 7, 2006, at 5. The

record is of no assistance to defendant. Mr. Grantham estimated that the aircraft plaintiff provided in the exchange were worth over $1,000,000.00 in 1989. See Tr. 140-43. Further, defendant failed to produce evidence disputing Mr. Grantham's estimates, or to provide an estimate as to the value of the C-130A airplanes as of the date of exchange. 5/ While defendant requests $2,400,000.00 in restitution, that amount is supported neither by documentary evidence nor testimony.

Defendant argues also that plaintiff should have known that the program was not authorized because "the enormous difference in the value of consideration provided and received by IAR is what prompted IAR to demand that it be allowed to participate in the program." Def.'s Br. filed Nov. 7, 2006, at 5-6. The evidence does not support this assertion. In contacting his congressional representatives, Mr. Grantham merely was seeking the same treatment as plaintiff's competitors. Moreover, far from being "a give-away program," the evidence established that, in addition to giving the Forest Service three historic aircraft, plaintiff spent approximately $2,000,000.00 retro-fitting the three C-130A airplanes. Plaintiff's investment in the C-130A airplanes includes the following expenditures: (1) over $1,200,000.00 for retardant tank equipment; (2) between $120,000.00 and $140,000.00 per plane to place improved or different radio equipment and avionics into the aircraft, so that the aircraft would meet civilian licensing requirements; (3) $20,650.00 to send staff to ground school to learn the policies and procedures for training on the C-130As; and (4) between $120,000.00 and $170,000.00 to maintain each C-130A annually.

Accordingly, the court finds that plaintiff is entitled to the safe harbor provided for in 40 U.S.C. § 544. Plaintiff has produced a Bill of Sale for each C-130A at issue in the case, see PX 12; PX 13, and provided evidence that it is a *bona fide* purchaser for value. 6/

Defendant's counterclaim asserts that the Government was entitled to recover the value of the three airplanes because the exchange agreement was void from the beginning.

---

5/ Although Mr. Hooper testified that the reported acquisition cost was $3,188,698.00 per aircraft, Tr. 165; see DX 12 at 5, he was unable to provide the year of acquisition, Tr. 166.

6/ Notwithstanding that defendant has not challenged plaintiff's characterization of the C-130A airplanes as "surplus property," the court in Pacific Harbor Capital, Inc. v. United States Department of Agriculture, 845 F. Supp. 1, 2-3 (D.D.C. 1993), a related case also involving the exchange program, found that the C-130As were surplus property. The court reached this conclusion despite the fact that the General Service Administration never determined the airplanes to be surplus property.

See Def.'s Answer and Counterclaim, filed Aug. 21, 2003, at 8. Defendant is seeking $2,400,000.00, plus interest, for the value of the aircraft or return of the C-130A airplanes. In its pretrial memorandum, defendant states that "IAR is liable to the Government pursuant to a theory of unjust enrichment or implied-in-law contract." Def.'s Br. filed Nov. 7, 2006, at 8. Although the court's jurisdiction usually does not extend to claims based upon restitution or implied-in-law contracts, 28 U.S.C. §§ 1503, 2508 (2000), provide the court with jurisdiction over such claims when brought by the government as a counterclaim. Barrett Ref. Corp. v. United States, 242 F.3d 1055, 1062-63 (Fed. Cir. 2001) (citing Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536 (1946), which found that purpose of predecessor to 28 U.S.C. §§ 1503, 2508 was "to permit the government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the government and a claimant against it." Id. at 539.).

To succeed on a claim of restitution based on a theory of unjust enrichment, the Government must establish the following elements: "(1) a benefit conferred on the [plaintiff] by the [Forest Service]; (2) an appreciation or knowledge by the [plaintiff] of the benefit; and (3) the acceptance or retention by the [plaintiff] of the benefit under such circumstances as to make it inequitable for the [plaintiff] to retain the benefit without payment of its value." 26 Richard A. Lord, Williston on Contracts § 68:5 (4th ed.). 7/ Additionally, to recover, the Government must "'prove with reasonable certainty the quantum benefit retained by the [aggrieved party] despite the government's breach.'" Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1052 (Fed. Cir. 2006) (citing WestFed Holdings, Inc. v. United States, 407 F.3d 1352, 1370 (Fed. Cir. 2005) and Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 769 (Fed. Cir. 1987)).

Defendant did not produce evidence to meet its burden. First, it has not shown that it was inequitable for plaintiff to retain the three C-130A airplanes. Moreover, plaintiff has established that it was a *bona fide* purchaser for value. The court therefore finds that defendant has failed to demonstrate that the plaintiff was unjustly enriched. Further, defendant has offered no proof as to the value of the aircraft. Defendant claims that the aircraft are worth $2,400,000.00 without evidence on how they were valued, evidence on when they were valued, or other evidence that could establish the value of the aircraft.

---

7/ The Federal Circuit has cited Williston on Contracts with approval. See, e.g. Nat'l Australia Bank v. United States, 452 F.3d 1321, 1329 (Fed. Cir. 2006); Old Stone Corp. v. United States, 450 F.3d 1360, 1371-72 (Fed. Cir. 2006); First Nationwide Bank v. United States, 431 F.3d 1342, 1349 (Fed. Cir. 2005).

Although it largely abandoned the argument at trial, defendant previously charged in its pretrial memorandum that the Espionage Act, 18 U.S.C. § 793 (2000), obligates plaintiff to return the C-130A aircraft. The Espionage Act provides: "[w]hoever, lawfully having possession of, access to, control over, or being entrusted with any . . . instrument, appliance, or note relating to the national defense . . . willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it . . . Shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. § 793(d). Defendant argues that the Espionage Act applies "even to innocent purchasers of surplus equipment." Def.'s Br. filed Nov. 7, 2006, at 6. Defendant relies on two cases from the 1960s: Dubin v. United States, 289 F.2d 651 (Ct. Cl. 1961) ("Dubin I"), and Dubin v. United States, 363 F.2d 938 (Ct. Cl. 1966) ("Dubin II"). The Dubin cases, however, are distinguishable from the present case.

Plaintiff in Dubin I and Dubin II acquired radar and radio equipment, which had been sold as surplus property by the Government. In summer 1950 plaintiff purchased four lots of property from the Government at auction and purchased more surplus equipment from third parties. The lot at issue in Dubin I and Dubin II, No. 23, contained surplus radar receivers and radar transmitter-receiver units, among other items. In August 1950 it was discovered that some of the surplus property was classified equipment. Plaintiff complied with the United States Navy's repossession of "83 Mark 31 Model 1, 'S' Band radar transmitter receiver units, 81 PU/Mark 31 power supply units, 136 Mark 1 Model 2 'S' Band radar receivers, type CG-46ACX, and one dynamotor power unit, type CG-211078." Dubin II at 941. Plaintiff then sued in the United States Court of Claims for the fair market value of the property. As defendant states, in Dubin I the Government successfully argued that the controlling statute was the Espionage Act and not 40 U.S.C. § 484(d), which is identical in substance to 18 U.S.C. § 793(d). The court denied summary judgment, stating "[i]f there is a genuine controversy as to whether the articles here in question related to the national defense, . . . the case will have to go to trial." Dubin I at 655.

After trial the court found in Dubin II that the "Mark 1 Model 2 and the dynamotor power unit were components of the 'Pelican' missile . . . . [Defendant] also developed at the trial that the Mark 31 Model 1 and the PU/Mark 31 power supply unit were components of the 'Bat' missile." Dubin II at 941. The court concluded that

> these instruments, being components of the Pelican and Bat missiles, contained a number of elements not found in commercial radar or on the commercial market; in particular the homing devices, by which the missiles changed course with a change in course of the target were unknown to the general public during the year 1950.

Dubin II at 942. The court also found that the defendant proved that the equipment seized from plaintiff was "'classified' in the security sense of the word, *i.e.*, the guidance system equipment of the Pelican missile . . . was classified 'Restricted' in August 1950." Id.

Defendant contends that the C-130A airplane qualifies as an "instrument" or "appliance" relating to national defense, 18 U.S.C. § 793, because the C-130A is on the United States Munitions List pursuant to the Arms Export Control Act, 22 U.S.C. §§ 2778, 2794. Def.'s Br. filed Nov. 7, 2006, at 7. The Munitions List includes "[a]ircraft . . .which are specifically designed, modified, or equipped for military purposes." 22 C.F.R. § 121.1 (2006). 8/

This description does not render the instant case analogous to Dubin I and Dubin II. In the past courts have applied section 793(d) of the Espionage Act to instruments or appliances, such as radar and radio equipment, see Dubin I and Dubin II, or Ballistic Missiles, see AST/Servo Sys., Inc. v. United States, 449 F.2d 789 (Ct. Cl. 1971). Justice Hand's remarks in the 1945 case of United States v. Heine, 151 F.2d 813 (2d Cir. 1945), regarding 50 U.S.C. § 32 9/ offer appropriate guidance in these circumstances:

---

8/ The Munitions List excludes some demilitarized aircraft, but this list does not include the C-130A. 22 C.F.R. § 121.3 (2006).

9/ Section 32 of Title 50, a criminal statute, quoted in Heine, provided:

> "Unlawfully disclosing information affecting national defense. Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by imprisonment for not more than twenty years."

Heine, 151 F.2d at 814 n.1.

> It seems plain that the section cannot cover information about all those activities which became tributary to "the national defense" in time of war; for in modern war there are none which do not. . . . [E]very part in short of the national economy and everything tending to disclose the national mind are important in time of war and will then "relate to the national defense."

Id. at 815.

Given that defendant has neither shown that the C-130A contains elements that were unknown to the general public when sold as surplus property, nor demonstrated that the C-130A was "classified" outside of its inclusion on the Munitions List, the court is unable to conclude that the Espionage Act applies in this case. Furthermore, even if the Espionage Act did apply, plaintiff would be entitled to compensation for its "actual expenditures." AST/Servo Sys., Inc., 449 F.2d at 790, 792 (acknowledging that "Espionage Act does not explicitly direct any measure of recovery" but awarding plaintiff out-of-pocket expenses); see also Dubin II at 943.

**CONCLUSION**

Plaintiff has proved that it was a *bona fide* purchaser for value of the subject aircraft. Defendant has failed to prove that it is entitled to recover on its counterclaim. Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment (1) for plaintiff on plaintiff's prayer that the contracting officer's decision be set aside and (2) for plaintiff against defendant on defendant's counterclaim.

**IT IS SO ORDERED**.

s/ Christine O.C. Miller

________________________________

**Christine Odell Cook Miller**
Judge