IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INTERNATIONAL AIR RESPONSE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 00-428C |
| | ) | |
| vs. | ) | |
| | ) | (Assigned to the Honorable Christine |
| THE UNITED STATES, | ) | O.C. Miller) |
| | ) | |
| Defendant. | ) | E-Filed December 19, 2007 |
| | ) | |

**PLAINTIFF IAR'S REPLY ON ITS APPLICATION FOR ATTORNEYS' FEES AND COSTS**

Before addressing the Government's specific arguments, the Court should note what the Government does not seriously dispute in its response. The Government does not contest that the result in this case was, in the Court's prior words, "quite one-sided;" that IAR "was done wrong by the Forest Service;" or that the Government's sole witness at trial "lacked conviction in his own testimony." (Order at 4, 7, 11). Nor does the Government challenge IAR's account of the Government's unreasonable settlement conduct in this case – conduct which prolonged the litigation unnecessarily. (IAR Memorandum at 5-6). Perhaps most important, the Government made no serious effort to explain on what basis it continued to insist right up through trial that the planes it exchanged were worth millions as air tankers when, in 200**2**, the Forest Service itself declared the planes unsafe to fly.

IAR is (and was) a small company that the Government dragged through litigation seemingly on unthinking, auto-pilot mode for years and years, while lacking any

meaningful basis for doing so. Again, in the Court's prior words, "Mr. Grantham has gone through enough, this has been a virtual odyssey." (Tab A, Tr. Trans. at 181). That the Government maintained its position without meaningful basis was not because of the Government's attorney, who was always professional, but rather of internal politics at the Forest Service, which disregarded IAR's interests for too long. This is thus exactly the type of case in which an EAJA award is appropriate.

## II. Eligibility

### A. IAR Was the Prevailing Party

The Government does not dispute that IAR was the prevailing party and thus presumptively entitled to a fee award unless the Government meets its burden of establishing that its position was substantially justified. *See Scarborough v. Principi*, 124 S. Ct. 1856, 1860 (2004).

### B. IAR Is Not Too Large to Qualify for An Award

The Government challenges whether IAR qualifies for a fee award, citing a lack of specifics in the record regarding IAR's size and value.

Under the EAJA, IAR would not be eligible for a fee award if its net value at the time it filed its complaint exceeded $7,000,000. *See* 28 U.S.C. § 2412(d)(2)(B). IAR filed this action in 2000. In 2000, it had ordinary income of $195,368. According to the detailed balance sheet attached to its 2000 federal income tax return, IAR's liabilities exceeded its assets by and, consequently, the company had negative equity. Indeed, the company's retained earnings by year-end 2000 was <u>negative</u> $421,891. (*See* Tab B). IAR's net value thus came nowhere even remotely close to the $7,000,000 cap.

Similarly, the EAJA provides that a company must have less than 500 employees. *See* 28 U.S.C. § 2412(d)(2)(B). Even counting seasonal and part-time employees, IAR only had approximately 25 employees in 2000. (*See* Tab C).

The Government is well aware of IAR's financial history and limited resources, having deposed Mr. Grantham twice. At his deposition in 2005, he was questioned directly about his tax returns, the lack of any recent appraisals on the aircraft, and the limited scope of the company's operations. (*See* Tab D at 27-34). The Government claimed in its pleadings and at trial that the C-130As had great value, but the Court noted that at trial the Government "offered no proof as to the value of the aircraft." (Order at 13).

There is thus no basis to disqualify IAR from a fee request based on the EAJA's net worth or employee limitations.[1]

**III. The Government's Position Was Not Substantially Justified**

The Government's brief does not establish that the Government's position in this case was substantially justified. The Government makes three arguments, all of which should be rejected.

[1] There is no jurisdictional bar to IAR supplementing the record in support of its application to satisfy the net worth or employee requirements. *See, e.g., Bazalo v. West*, 150 F.3d 1380, 1382-84 (Fed. Cir. 1998) (holding that a party may supplement its application to provide proof regarding net worth). The Government is not unfairly prejudiced by supplementation given its familiarity with IAR's finances and the lack of any evidence that IAR somehow was too large or valuable to be eligible for a fee award.

### A. The Government Knew the Planes Had Minimal Value By 2002

As we pointed out in our initial memorandum, whether the Government's position was substantially justified should be determined by looking at the case as a whole, not discrete parts of the case. *See, e.g., Commissioner of INS v. Jean*, 496 U.S. 154, 161-2 (1990); *CEMS v. United States*, 65 Fed. Cl. 473, 483 (2005). The Government does not directly address that, as of 2002, it viewed the planes as unsafe for firefighting and thus would not contract for them. As the Government's witness, Mr. Hooper, explained, if the planes had been repossessed by the Government, as the Government sought to accomplish under one of its theories in the case, the Government "would not operate the[em] as air tankers" but instead it would give them to GSA to "dispose of them." (Tab A, Tr. Trans. at 175).

But even though the Government's view about the aircraft's value had changed dramatically by 2002, the Government never withdrew and in fact continued litigating its claim that the planes were worth millions as firefighting air tankers. Even at trial, the Government continued to try to suggest the planes had substantial value. After 2002, however, the Government not only had no substantial basis for its counterclaim it had *no* basis for it whatsoever.

### B. The Espionage Act

The Government's claim that the Espionage Act provided substantial support for its position is wrong for several reasons. The Government did not even raise the Espionage Act until years into this litigation; no mention, for example, is made of the Act in the Contracting Officer's decision, in the Government's answer to IAR's complaint; in

the Government's counterclaim, or even in the Government's response to IAR's motion to dismiss. The Espionage Act was never raised by the Government in the related actions in Oregon and Arizona. Indeed, while the planes were exchanged in 1989, it appears the Government's first mention of the Espionage Act occurred in approximately 2004. Moreover, the Government always was willing to allow IAR to keep the planes if it paid a large sum to the Government, so national security was obviously simply being used as a pretextual argument to coerce a settlement.

On the merits, the claim was patently flawed as well, as the Court concluded on pages 14-16 of its Order. The Government produced no evidence or witness whatsoever to substantiate that the planes contained technical or secret information or technology so as to even be governed by the Espionage Act. In the Court's words, the claim was "largely abandoned" by trial. (Order at 16). The best the Government can do is to show that the planes were still on the Munitions List, but, as the Court reasoned, that the planes were related somehow to the military means very little by itself for Espionage Act purposes. (*Id.*).

That the Government would implicitly threaten IAR with penalties under the Espionage Act, so deep into the litigation and without having proof of any real national security concern, only highlights that the Government's position in this case was far more severe than the merits warranted.

Moreover, even if the 1950s-era planes were governed by the Espionage Act, IAR always would have been entitled to be compensated for its out-of-pocket costs in having the transaction unwound, which, as the Court expressly concluded, would have resulted

in an “affirmative recovery” for IAR. (Tab A, Tr. Trans. at 180; *see also* Order at 16). Given that the Government’s primary demand was to be compensated for the planes, to the tune of over $2.4 million, and given that the netting calculation required by the case law would have yielded an affirmative recovery for IAR, the Government’s position clearly was not substantially justified.

**C. IAR Was A Bona Fide Grantee for Value**

The Government says that it was substantially justified in claiming that IAR was not a *bona fide* grantee as that term is used in 40 U.S.C. § 544. The Court concluded otherwise, ruling: “Mr. Grantham has detailed circumstances whereby he ably qualifies as a *bona fide* purchaser for value under any scenario dealing with the acquisition of the three aircraft.” (Tab A, Tr. Trans. at 179; *see also* Order at 12-13).

The Government never claimed it had any evidence that Mr. Grantham did anything dishonest or unethical vis-à-vis the Government. Nor did the Government claim that Mr. Grantham had failed to provide the aircraft it promised to provide under its exchange agreement. Instead, the Government says its position was substantially justified because Mr. Grantham somehow should have known the deal was not authorized or legitimate because he supposedly was getting too good a deal.

First, we have repeatedly cited, and the Government has repeatedly ignored, the case law making clear that a difference in value between what the Government exchanges and what the Government receives is largely irrelevant to determining whether someone was a *bona fide* grantee. The statutory scheme that includes section 544 was enacted near the end of World War II in order to help the Government dispose of surplus military and

other property quickly and in a manner that would stimulate the economy and encourage enterprising citizens to use the property in a way more productive than the Government would. *See United States v. Jones*, 176 F.2d 278, 288-90 (9th Cir. 1949). Given the statute's purposes, it soon was established that a mere difference in value between what the Government accepted and what the citizen received in no way undermines the legality of the transaction. *Id.* Thus, the Government's premise – that it somehow would matter if Mr. Grantham knew he was getting a really good deal – is legally wrong.

Moreover, as the Court found, "the record does not support" the Government's assertion that Mr. Grantham should have known the program was unauthorized because he supposedly was getting such a good deal. (Order at 12). Mr. Grantham's company not only provided aircraft of substantial value, but it was always understood that they would have to invest substantial sums to retrofit the planes in order to use them to fight fires. (*Id.* at 10-12). The Government's response overlooks these uncontroverted facts.

Perhaps the best evidence that the Government has no substantial basis for saying Mr. Grantham "should have known" the transactions were unauthorized is that the Government itself could not internally agree whether the exchanges were authorized or not for several years. (Order at 11). For years, the Forest Service insisted the program was in fact authorized and sought to justify it on several grounds. (*See id.*; *see also* Tab A, Tr. Trans. at 177-78). Yet the Government claims that Mr. Grantham, a rancher and pilot in Arizona who all agree used no legal assistance in the transaction, somehow "should have known" in 1989 the Forest Service lacked authority to make the exchanges. That position was hardly "substantially justified."

## IV. Amount

IAR overlooked the $125 cap limitation that presumptively applies to EAJA applications. Thus, its request as detailed in its Memorandum was overstated.

The total amount of fees, recalculated at $125 per hour, is $92,350, of which $32,112.50 was prior to the Federal Circuit's ruling that IAR's complaint should be deemed timely filed.

IAR's request for reimbursement of costs remains as set forth on page 8 of its Memorandum. The total of the requested cost reimbursement is $20,649.39.

## V. Conclusion

The Court is very familiar with this matter, with the tortured history regarding settlement efforts in front of Judge Firestone and otherwise, and with what IAR submits was the paucity of evidence submitted by the Government at trial that IAR did anything wrong or otherwise should have been forced to spend years litigating with the Government. The fee award requested would reimburse IAR for only a small portion of its out-of-pocket expense in this matter and would be fully supported by both the terms and the purposes of the EAJA.

Respectfully submitted,

Date: December 19, 2007

By: s/ Randy Papetti

Randy Papetti
Lewis and Roca LLP
40 North Central Avenue
Phoenix, Arizona 85004-4429
602-262-5337 Telephone
602-734-3865 Facsimile
Attorney of Record for Plaintiff
International Air Response

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INTERNATIONAL AIR RESPONSE, INC., Plaintiff, | ) | Docket No.: 00-428C |
| v. | ) | |
| UNITED STATES, Defendant. | ) | |

Courtroom 7, Room 508
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday,
November 15, 2006

The parties met, pursuant to notice of the Court, at 9:02 a.m.

BEFORE: HONORABLE CHRISTINE ODELL COOK MILLER
Judge

APPEARANCES:

For the Plaintiff:

RANDY S. PAPETTI, Esquire
Lewis and Roca LLP
40 North Central Avenue
Phoenix, Arizona 85004
(602) 262-5337

For the Defendant:

ROGER A. HIPP, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-3091

APPEARANCES: (Cont'd.)

Also for the Defendant:

ELIN DUGAN, Esquire
U.S. Department of Agriculture
1400 Independence Avenue
Mail Stop 1415
Washington, D.C. 20250
(202) 720-4978

issued. Obviously the Agency had discussions about what will we do with the aircraft once we get those back?

Q Does the Forest Service have a purpose for those airplanes as you know to your extent?

A There is the potential for us to use them.

Q For what purpose?

A Well, again it depends on how they came back. Again, IAR isn't the only operator that was involved, but if those aircraft came back what I call intact with the tanks in them -- at the time, prior to 2003, we would have contracted out to use those aircraft as air tankers.

Q How about now?

A Well, due to the unfortunate incidents with the wings collapsing in 2003 and our grounding of the C-130As we would not operate those as air tankers today.

Q So does the Forest Service have any other planned purpose for these planes?

A We would declare them excess to GSA.

Q Which would mean what?

THE COURT: We'd go through another round.

THE WITNESS: GSA under their authority would then dispose of them.

Q If I understood in your answer and my recollection of the OIG report there was some disagreement between the Forest Service and the OIG as to whether the Forest Service had authority to enter into the transaction; the Forest Service suggesting it did, and if not why not. Is that fair?

A There was disagreement on that initially. I think the lengthier conversation was over was there a way to make them a good agreement, something founded on a regulation or statute. That was really the meat of the dialogue that took the most time is looking for an alternative to make them legitimate or a legally based document.

Q But you're aware, aren't you, sir, that initially the Forest Service did take the position that it did have authority and argued under these regulations that it did have authority until the OIG concluded otherwise?

A We did have discussion the OIG and with Office of General Counsel that at least initially we thought we had authority to enter into these agreements.

Q Then even after the report came out there was some disagreement on that point for a while, correct?

A There were some folks within the Agency who disagreed with the OIG's audit finding.

Q If Judge Miller concludes that there has to be a rescission of these claims back and forth and if she concludes that under the applicable law that IAR is entitled to money as part of that exchange, is the Forest Service prepared to actually follow through and pay IAR for any costs associated with that retraction?

A We'd be prepared to carry out the Judge's ruling.

MR. PAPETTI: No further questions, Your Honor.

MR. HIPP: I have no re-examination, Your Honor.

THE COURT: Thank you very much, Mr. Hooper. You can retake your place.

(Witness excused.)

THE COURT: Off the record.

(Whereupon, a short recess was taken.)

THE CLERK: Be seated.

THE COURT: We went off the record to confer with counsel and have party consultations as necessary. Before we close proceedings today is there any request for closing argument?

MR. PAPETTI: I don't have any, Your Honor,

unless you have any questions you'd like answered.

THE COURT: I don't believe so.

Mr. Hipp, do you?

MR. HIPP: In light of that we don't request argument.

THE COURT: Counsel may be seated. As I told counsel off the record the record will be closed with the official filing of the exhibits, and I'll enter an order closing proof upon their filing. I should say the official filing of the transcript proceedings which is I believe on a 30 day order and the filing of exhibits which Ms. Brodsky will be handling, so Mr. Hipp will deliver the precious Defendant's Exhibit No. 15 to her custody in addition to one copy to each of your exhibit books and then she'll therefore have all the exhibits, and Defendant's Exhibit No. 16, a copy of the regulations.

The Court has heard testimony today from two witnesses who have given open and forthright testimony. I was particularly impressed with the testimony of Plaintiff's witness and principal for these proceedings, Mr. Grantham. Mr. Grantham has detailed circumstances whereby he ably qualifies as a bona fide purchaser for value under any scenario dealing with the acquisition of the three aircraft.

In a subsequent written opinion I will detail findings to support that ultimate finding. I will also give an opinion in the alternative about a value if any restitution would be an appropriate remedy should the first finding for any reason not meet with appellate favor. Plaintiff has not pleaded for damages.

If I do proceed to the point two alternative and if I were not upheld on point one, Plaintiff would have an affirmative recovery. There is no proof that these aircraft were valued by the individuals who valued them at the amount of $2.4 million in toto. The individuals who valued them have not testified.

They have been totally discredited through other proceedings against them for violation of laws and finally the documents themselves do not establish value or we haven't had any other documents that establish value, so we have neither testimony nor documentary evidence to establish value on the asserted counterclaim as to which the government bears the burden of proof.

But Plaintiff has fully discharged its burden of proof to show that Plaintiff was a bona fide purchaser for value of the subject aircraft. I will be issuing findings of fact and conclusions of law in

accordance with the foregoing which I offer the parties today only for two purposes.

One, because I think that Mr. Grantham has gone through enough, this has been a virtual odyssey; and two, because I urge the government to expeditiously end this matter by other means, which I'm giving it the opportunity to do unless or until I have an opinion ready for publication in which case it will be entered.

So I have instructed Mr. Hipp that if the government finally sees this case in a reasonable light that Mr. Hipp should advise Ms. Kelly, my law clerk, by no later than 30 days from today that the government is settling this case on terms that the Plaintiff has deemed to be agreeable and that a stipulation of dismissal will be filed by a date certain.

I want to thank Ms. Brodsky and counsel. I understand Mr. Hipp inherited this case and I appreciate the candor of Mr. Hooper, who is a credit to the government because anybody who talks that fast about things that are so complicated has got to be intelligent. Also, for Mr. Grantham's patience in this matter.

I usually have anything requiring a trial in

# EXHIBIT B

2000 **FEDERAL INCOME TAX SUMMARY** PAGE 1

CLIENT 0902 INTERNATIONAL AIR RESPONSE, INC. 86-0321772

| | 2000 | 1999 | DIFF |
|---|---|---|---|
| **ORDINARY INCOME** | | | |
| GROSS RECEIPTS LESS RETURNS/ALLOWANCE . | 2,681,267 | 2,305,740 | 375,527 |
| COST OF GOODS SOLD (SCHED. A, LINE 8) . | 1,699,923 | 1,374,329 | 325,594 |
| GROSS PROFIT . . . . . . . . . . . . . . . . . . | 981,344 | 931,411 | 49,933 |
| OTHER INCOME . . . . . . . . . . . . . . . . . . | 0 | 9,573 | -9,573 |
| TOTAL INCOME (LOSS) . . . . . . . . . . . . | 981,344 | 940,984 | 40,360 |
| **ORDINARY DEDUCTIONS** | | | |
| COMPENSATION OF OFFICERS . . . . . . . . . | 0 | 90,483 | -90,483 |
| SALARIES/WAGES (LESS EMPLOYMENT CR.) . . | 107,279 | 27,215 | 80,064 |
| REPAIRS AND MAINTENANCE . . . . . . . . . | 21,506 | 18,570 | 2,936 |
| RENTS . . . . . . . . . . . . . . . . . . . . | 4,518 | 11,125 | -6,607 |
| TAXES AND LICENSES . . . . . . . . . . . . | 4,832 | 12,404 | -7,572 |
| INTEREST . . . . . . . . . . . . . . . . . . | 267,410 | 138,505 | 128,905 |
| DEPRECIATION FROM FORM 4562 . . . . . . . | 11,510 | 16,950 | -5,440 |
| DEPRECIATION CLAIMED ON SCHEDULE A . . . | 7,146 | 13,135 | -5,989 |
| TOTAL DEPRECIATION . . . . . . . . . . . . | 4,364 | 3,815 | 549 |
| PENSION, PROFIT-SHARING, ETC. PLANS . . | 0 | 4,962 | -4,962 |
| EMPLOYEE BENEFIT PROGRAMS . . . . . . . . | 12,645 | 794 | 11,851 |
| OTHER DEDUCTIONS . . . . . . . . . . . . . | 363,422 | 346,085 | 17,337 |
| TOTAL DEDUCTIONS . . . . . . . . . . . . . | 785,976 | 653,958 | 132,018 |
| ORDINARY INCOME (LOSS) . . . . . . . . . . | 195,368 | 287,026 | -91,658 |
| **REFUND OR AMOUNT DUE** | | | |
| BALANCE DUE . . . . . . . . . . . . . . . . | 0 | 0 | 0 |
| **SCHEDULE K – INCOME** | | | |
| ORDINARY INCOME (LOSS) . . . . . . . . . . | 195,368 | 287,026 | -91,658 |
| INTEREST INCOME . . . . . . . . . . . . . . | 6,248 | 7,861 | -1,613 |
| ORDINARY DIVIDENDS . . . . . . . . . . . . | 0 | 311 | -311 |
| NET LONG-TERM CAPITAL GAIN (LOSS) . . . | 0 | 281 | -281 |
| OTHER INCOME (LOSS). . . . . . . . . . . . | 0 | 3,000 | -3,000 |
| **SCHEDULE K – DEDUCTIONS** | | | |
| CHARITABLE CONTRIBUTIONS . . . . . . . . . | 1,620 | 136 | 1,484 |
| SECTION 179 EXPENSE DEDUCTION . . . . . . | 20,000 | 13,680 | 6,320 |
| **SCHEDULE K – INVESTMENT INTEREST** | | | |
| INV. INC. ON LINES 4A,4B,4C & 4F . . . . | 6,248 | 8,172 | -1,924 |
| **SCHEDULE K – TAX PREFERENCE ITEMS** | | | |
| DEPR. ADJUST. ON PROPERTY AFTER 1986 . . | -10,154 | -18,105 | 7,951 |
| **SCHEDULE K – OTHER ITEMS** | | | |
| NONDEDUCTIBLE EXPENSES . . . . . . . . . . | 0 | 30,788 | -30,788 |
| TOTAL PROPERTY DISTRIBUTIONS . . . . . . . | 16,388 | 240,000 | -223,612 |
| INCOME (LOSS) (SCHEDULE M-1) . . . . . . . | 179,996 | 284,663 | -104,667 |

## SCHEDULE L – BALANCE SHEET

| | 2000 | 1999 | DIFF |
|---|---|---|---|
| BEGINNING ASSETS . . . . . . . . . . . . . . | 520,169 | 792,940 | -272,771 |
| BEGINNING LIABILITIES & EQUITY . . . . . | 520,169 | 792,940 | -272,771 |
| ENDING ASSETS . . . . . . . . . . . . . . . | 862,897 | 520,169 | 342,728 |
| ENDING LIABILITIES & EQUITY . . . . . . . | 862,897 | 520,169 | 342,728 |

Form **1120S** — Department of the Treasury, Internal Revenue Service

# U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has timely filed Form 2553 to elect to be an S corporation.
▶ See separate instructions.

OMB No. 1545-0130 — **2000**

For calendar year 2000, or tax year beginning 7/01, 2000, and ending 6/30, 20 01

A Effective date of election as an S corporation: 9/11/1987

B Business code no. (see pages 29-31): 481000

Use IRS label. Otherwise, print or type.

INTERNATIONAL AIR RESPONSE, INC.
22000 SOUTH PRICE ROAD
CHANDLER, AZ 85248

COPY

C Employer identification number: 86-0321772

D Date incorporated: 7/15/1976

E Total assets (see page 11): $ 862,897

F Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Change in address (4) ☐ Amended return

G Enter number of shareholders in the corporation at end of the tax year ▶ 1

**Caution:** Include **only** trade or business income and expenses on lines 1a through 21. See page 11 of the instructions for more information.

| | Line | Description | | | Line | Amount |
|---|---|---|---|---|---|---|
| INCOME | 1 a | Gross receipts or sales 2,681,267 b Less returns & allowances ____ c Bal ▶ | | | 1c | 2,681,267 |
| | 2 | Cost of goods sold (Schedule A, line 8) | | | 2 | 1,699,923 |
| | 3 | Gross profit. Subtract line 2 from line 1c | | | 3 | 981,344 |
| | 4 | Net gain (loss) from Form 4797, Part II, line 18 (attach Form 4797) | | | 4 | |
| | 5 | Other income (loss) (attach schedule) | | | 5 | |
| | 6 | **Total income (loss).** Combine lines 3 through 5 ▶ | | | 6 | 981,344 |
| DEDUCTIONS (SEE PG 12 INSTRS FOR LIMITATIONS) | 7 | Compensation of officers | | | 7 | |
| | 8 | Salaries and wages (less employment credits) | | | 8 | 107,279 |
| | 9 | Repairs and maintenance | | | 9 | 21,506 |
| | 10 | Bad debts | | | 10 | |
| | 11 | Rents | | | 11 | 4,518 |
| | 12 | Taxes and licenses | | | 12 | 4,832 |
| | 13 | Interest | | | 13 | 267,410 |
| | 14 a | Depreciation (if required, attach Form 4562) | 14a | 11,510 | | |
| | b | Depreciation claimed on Schedule A and elsewhere on return | 14b | 7,146 | | |
| | c | Subtract line 14b from line 14a | | | 14c | 4,364 |
| | 15 | Depletion **(Do not deduct oil and gas depletion.)** | | | 15 | |
| | 16 | Advertising | | | 16 | |
| | 17 | Pension, profit-sharing, etc., plans | | | 17 | |
| | 18 | Employee benefit programs | | | 18 | 12,645 |
| | 19 | Other deductions (attach schedule) SEE STATEMENT 1 | | | 19 | 363,422 |
| | 20 | **Total deductions.** Add the amounts shown in the far right column for lines 7 through 19 ▶ | | | 20 | 785,976 |
| | 21 | Ordinary income (loss) from trade or business activities. Subtract line 20 from line 6 | | | 21 | 195,368 |
| TAX AND PAYMENTS | 22 | **Tax:** a Excess net passive income tax (att. schedule) | 22a | | | |
| | b | Tax from Schedule D (Form 1120S) | 22b | | | |
| | c | Add lines 22a & 22b (see page 15 of the instrs for addl taxes) | | | 22c | |
| | 23 | **Payments:** a 2000 estimated tax payments & amt applied from 1999 return | 23a | | | |
| | b | Tax deposited with Form 7004 | 23b | | | |
| | c | Credit for Federal tax paid on fuels (attach Form 4136) | 23c | | | |
| | d | Add lines 23a through 23c | | | 23d | |
| | 24 | Estimated tax penalty. Check if Form 2220 is attached ▶ ☐ | | | 24 | |
| | 25 | **Tax due.** If the total of lines 22c and 24 is larger than line 23d, enter amount owed. See page 4 of the instructions for depository method of payment ▶ | | | 25 | 0 |
| | 26 | **Overpayment.** If line 23d is larger than the total of lines 22c and 24, enter amount overpaid ▶ | | | 26 | |
| | 27 | Enter amount of line 26 you want: **Credited to 2001 estimated tax** ▶ ____ **Refunded** ▶ | | | 27 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ Signature of officer ____ Date ____ ▶ Title ____

**Paid Preparer's Use Only**

Preparer's signature ▶ Paul D. Petersen — Date 3-11-02 — Check if self-employed ☒ — Preparer's SSN or PTIN P00082239

Firm's name (or yours, if self-employed) address, and ZIP code ▶ PAUL D. PETERSEN, CPA, PLC, BLD. 11, #127, 1423 S. HIGLEY, MESA, AZ 85206-3450 — EIN ____ — Phone No. (480) 505-6244

Form 1120S (2000) INTERNATIONAL AIR RESPONSE, INC. 86-0321772 Page **2**

## Schedule A Cost of Goods Sold (see page 16 of the instructions)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | 7,500 |
| 2 | Purchases | 2 | 213,869 |
| 3 | Cost of labor | 3 | 450,765 |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) SEE STATEMENT 2 | 5 | 1,063,731 |
| 6 | **Total.** Add lines 1 through 5 | 6 | 1,735,865 |
| 7 | Inventory at end of year | 7 | 35,942 |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 1,699,923 |

9a Check all methods used for valuing closing inventory:
(i) ☐ Cost as described in Regulations section 1.471-3
(ii) ☒ Lower of cost or market as described in Regulations section 1.471-4
(iii) ☐ Other (specify method used and attach explanation) ▶

b Check if there was a writedown of "subnormal" goods as described in Regulations section 1.471-2(c) ▶ ☐

c Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ▶ ☐

d If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO | 9d |

e Do the rules of section 263A (for property produced or acquired for resale) apply to the corporation? ☐ Yes ☒ No

f Was there any change in determining quantities, cost, or valuations between opening and closing inventory? ☐ Yes ☒ No
If "Yes," attach explanation.

## Schedule B Other Information

| | | Yes | No |
|---|---|---|---|
| 1 | Check method of accounting: (a) ☐ Cash (b) ☐ Accrual (c) ☒ Other (specify) ▶ MODIFIED CASH | | |
| 2 | Refer to the list on pages 29 through 31 of the instructions and state the corporation's principal: (a) Business activity ▶ AIRCRAFT SERVICES (b) Product or service ▶ FIREFIGHTING, ETC | | |
| 3 | Did the corporation at the end of the tax year own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) If "Yes," attach a schedule showing: (a) name, address, and employer identification number and (b) percentage owned | | X |
| 4 | Was the corporation a member of a controlled group subject to the provisions of section 1561? | | X |
| 5 | Check this box if the corporation has filed or is required to file **Form 8264,** Application for Registration of a Tax Shelter ▶ ☐ | | |
| 6 | Check this box if the corporation issued publicly offered debt instruments with original issue discount ▶ ☐ If so, the corporation may have to file **Form 8281,** Information Return for Publicly Offered Original Issue Discount Instruments. | | |
| 7 | If the corporation: (a) filed its election to be an S corporation after 1986, (b) was a C corporation before it elected to be an S corporation or the corporation acquired an asset with a basis determined by reference to its basis (or the basis of any other property) in the hands of a C corporation, and (c) has net unrealized built-in gain (defined in section 1374(d)(1)) in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years (see page 17 of the instructions) ▶ $ | | |
| 8 | Check this box if the corporation had accumulated earnings and profits at the close of the tax year (see page 18 of the instructions) ▶ ☒ | | |

**Note:** If the corporation had assets or operated a business in a foreign country or U.S. possession, it may be required to attach **Schedule N (Form 1120),** Foreign Operations of U.S. Corporations, to this return. See Schedule N for details.

## Schedule K Shareholders' Shares of Income, Credits, Deductions, etc.

INCOME (LOSS)

| (a) Pro rata share items | | | (b) Total Amount |
|---|---|---|---|
| 1 Ordinary income (loss) from trade or business activities (page 1, line 21) | | 1 | 195,368 |
| 2 Net income (loss) from rental real estate activities (attach Form 8825) | | 2 | |
| 3 a Gross income from other rental activities | 3a | | |
| b Expenses from other rental activities | 3b | | |
| c Net income (loss) from other rental activities. Subtract line 3b from line 3a | | 3c | |
| 4 Portfolio income (loss): | | | |
| a Interest income | | 4a | 6,248 |
| b Ordinary dividends | | 4b | |
| c Royalty income | | 4c | |
| d Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) | | 4d | |
| e Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) | | | |
| (1) 28% rate gain (loss) ▶ (1) Total for year ▶ | | 4e(2) | |
| f Other portfolio income (loss) (attach schedule) | | 4f | |
| 5 Net section 1231 gain (loss) (other than due to casualty or theft) (attach Form 4797) | | 5 | |
| 6 Other income (loss) (attach schedule) | | 6 | |

**Schedule K Shareholders' Shares of Income, Credits, Deductions, etc. (continued)**

| Section | | (a) Pro rata share items | Line | (b) Total amount |
|---|---|---|---|---|
| Deductions | 7 | Charitable contributions (attach schedule) SEE STATEMENT 3 | 7 | 1,620 |
| | 8 | Section 179 expense deduction (attach Form 4562) | 8 | 20,000 |
| | 9 | Deductions related to portfolio income (loss) (itemize) | 9 | |
| | 10 | Other deductions (attach schedule) | 10 | |
| Investment Interest | 11 a | Interest expense on investment debts | 11a | |
| | b (1) | Investment income included on lines 4a, 4b, 4c, and 4f above | 11b(1) | 6,248 |
| | (2) | Investment expenses included on line 9 above | 11b(2) | |
| Credits | 12 a | Credit for alcohol used as fuel (attach Form 6478) | 12a | |
| | b | Low-income housing credit: | | |
| | (1) | From partnerships to which section 42(j)(5) applies for property placed in service before 1990 | 12b(1) | |
| | (2) | Other than on line 12b(1) for property placed in service before 1990 | 12b(2) | |
| | (3) | From partnerships to which section 42(j)(5) applies for property placed in service after 1989 | 12b(3) | |
| | (4) | Other than on line 12b(3) for property placed in service after 1989 | 12b(4) | |
| | c | Qualified rehabilitation expenditures related to rental real estate activities (attach Form 3468) | 12c | |
| | d | Credits (other than credits shown on lines 12b and 12c) related to rental real estate activities | 12d | |
| | e | Credits related to other rental activities | 12e | |
| | 13 | Other credits | 13 | |
| Adjustments and Tax Preference Items | 14 a | Depreciation adjustment on property placed in service after 1986 | 14a | -10,154 |
| | b | Adjusted gain or loss | 14b | |
| | c | Depletion (other than oil and gas) | 14c | |
| | d (1) | Gross income from oil, gas, or geothermal properties | 14d(1) | |
| | (2) | Deductions allocable to oil, gas, or geothermal properties | 14d(2) | |
| | e | Other adjustments and tax preference items (attach schedule) | 14e | |
| Foreign Taxes | 15 a | Name of foreign country or U.S. possession ▶ | | |
| | b | Gross income sourced at shareholder level | 15b | |
| | c | Foreign gross income sourced at corporate level: | | |
| | (1) | Passive | 15c(1) | |
| | (2) | Listed categories (attach schedule) | 15c(2) | |
| | (3) | General limitation | 15c(3) | |
| | d | Deductions allocated and apportioned at shareholder level: | | |
| | (1) | Interest expense | 15d(1) | |
| | (2) | Other | 15d(2) | |
| | e | Deductions allocated and apportioned at corporate level to foreign source income: | | |
| | (1) | Passive | 15e(1) | |
| | (2) | Listed categories (attach schedule) | 15e(2) | |
| | (3) | General limitation | 15e(3) | |
| | f | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 15f | |
| | g | Reduction in taxes available for credit and gross income from all sources (attach schedule) | 15g | |
| Other | 16 | Section 59(e)(2) expenditures: a Type ▶ b Amount ▶ | 16b | |
| | 17 | Tax-exempt interest income | 17 | |
| | 18 | Other tax-exempt income | 18 | |
| | 19 | Nondeductible expenses | 19 | |
| | 20 | Total property distributions (including cash) other than dividends reported on line 22 below | 20 | 16,388 |
| | 21 | Other items and amounts required to be reported separately to shareholders (attach schedule) | | |
| | 22 | Total dividend distributions paid from accumulated earnings and profits | 22 | |
| | 23 | Income (loss). (Required only if Schedule M-1 must be completed.) Combine lines 1 through 6 in column (b). From the result, subtract the sum of lines 7 through 11a, 15f, and 16b | 23 | 179,996 |

## Schedule L Balance Sheets per Books

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash | | 56,384 | | 258,825 |
| 2a Trade notes and accounts receivable | | | | |
| b Less allowance for bad debts | | | | |
| 3 Inventories | | 7,500 | | 35,942 |
| 4 U.S. Government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets (attach schedule) ST.4 | | 50,461 | | 36,500 |
| 7 Loans to shareholders | | 159,428 | | 163,271 |
| 8 Mortgage and real estate loans | | | | |
| 9 Other investments (attach schedule) | | | | |
| 10a Buildings and other depreciable assets | 1,637,223 | | 1,728,516 | |
| b Less accumulated depreciation | 1,561,316 | 75,907 | 1,372,814 | 355,702 |
| 11a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 12 Land (net of any amortization) | | | | |
| 13a Intangible assets (amortizable only) | 545,565 | | | |
| b Less accumulated amortization | 375,076 | 170,489 | | |
| 14 Other assets (attach schedule) ST.5 | | | | 12,657 |
| 15 Total assets | | 520,169 | | 862,897 |
| **Liabilities and Shareholders' Equity** | | | | |
| 16 Accounts payable | | | | 111,412 |
| 17 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 Other current liabilities (attach schedule) ST.6 | | 103,722 | | 1,041,903 |
| 19 Loans from shareholders | | | | |
| 20 Mortgages, notes, bonds payable in 1 year or more | | 935,525 | | 130,297 |
| 21 Other liabilities (attach schedule) ST.7 | | 17,500 | | |
| 22 Capital stock | | 1,176 | | 1,176 |
| 23 Additional paid-in capital | | | | |
| 24 Retained earnings | | -537,754 | | -421,891 |
| 25 Adjustments to shareholders' equity | | | | |
| 26 Less cost of treasury stock | | ( ) | | ( ) |
| 27 Total liabilities and shareholders' equity | | 520,169 | | 862,897 |

## Schedule M-1 Reconciliation of Income (Loss) per Books With Income (Loss) per Return

(You are not required to complete this schedule if the total assets on line 15, column (d), of Schedule L are less than $25,000.)

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | 132,251 | 5 Income recorded on books this year not included on Schedule K, lines 1 through 6 (itemize): a Tax-exempt interest $ | |
| 2 Income included on Schedule K, lines 1 through 6, not recorded on books this year (itemize): | | | |
| 3 Expenses recorded on books this year not included on Schedule K, lines 1 through 11a, 15f, and 16b (itemize): a Depreciation $ 47,745 b Travel and entertainment $ | 47,745 | 6 Deductions included on Schedule K, lines 1 through 11a, 15f, and 16b, not charged against book income this year (itemize): a Depreciation $ | |
| | | 7 Add lines 5 and 6 | 0 |
| 4 Add lines 1 through 3 | 179,996 | 8 Income (loss) (Schedule K, line 23). Line 4 less line 7. | 179,996 |

## Schedule M-2 Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed (see page 27 of the instructions)

| | (a) Accumulated adjustments account | (b) Other adjustments account | (c) Shareholders' undistributed taxable income previously taxed |
|---|---|---|---|
| 1 Balance at beginning of tax year | 0 | 8,282 | |
| 2 Ordinary income from page 1, line 21 | 195,368 | | |
| 3 Other additions SEE STATEMENT 8 | 6,248 | | |
| 4 Loss from page 1, line 21 | ( ) | | |
| 5 Other reductions SEE STATEMENT 9 | (21,620) | ( ) | |
| 6 Combine lines 1 through 5 | 179,996 | 8,282 | |
| 7 Distributions other than dividend distributions | 16,388 | | |
| 8 Balance at end of tax year. Subtract line 7 from line 6 | 163,608 | 8,282 | |

**SCHEDULE K-1 (Form 1120S)**

Department of the Treasury Internal Revenue Service

# Shareholder's Share of Income, Credits, Deductions, etc.

▶ See separate instructions.

For calendar year 2000 or tax year beginning 7/01, 2000, and ending 6/30, 2001

OMB No. 1545-0130

**2000**

Shareholder's identifying number ▶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

Corporation's identifying number ▶86-0321772

Shareholder's name, address, and ZIP code
WILLIAM W GRANTHAM
22000 SOUTH PRICE ROAD
CHANDLER, AZ 85248

Corporation's name, address, and ZIP code
INTERNATIONAL AIR RESPONSE, INC.
22000 SOUTH PRICE ROAD
CHANDLER, AZ 85248

A Shareholder's percentage of stock ownership for tax year (see instructions for Schedule K-1) ▶ 100%
B Internal Revenue Service Center where corporation filed its return ▶ OGDEN, UT
C Tax shelter registration number (see instructions for Schedule K-1) ▶
D Check applicable boxes: (1) ☐ Final K-1 (2) ☐ Amended K-1

| | (a) Pro rata share items | | (b) Amount | (c) Form 1040 filers enter the amount in column (b) on: |
|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | 1 | 195,368 | See pages 4 and 5 of the Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | 2 Net income (loss) from rental real estate activities | 2 | | |
| | 3 Net income (loss) from other rental activities | 3 | | |
| | 4 Portfolio income (loss): | | | |
| | a Interest | 4a | 6,248 | Sch. B, Part I, line 1 |
| | b Ordinary dividends | 4b | | Sch. B, Part II, line 5 |
| | c Royalties | 4c | | Sch. E, Part I, line 4 |
| | d Net short-term capital gain (loss) | 4d | | Sch. D, line 5, col. (f) |
| | e Net long-term capital gain (loss): | | | |
| | (1) 28% rate gain (loss) | 4e(1) | | Sch. D, line 12, col. (g) |
| | (2) Total for year | 4e(2) | | Sch. D, line 12, col. (f) |
| | f Other portfolio income (loss) (attach schedule) | 4f | | (Enter on applicable line of your rtn) |
| | 5 Net section 1231 gain (loss) (other than due to casualty or theft) | 5 | | See Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | 6 Other income (loss) (attach schedule) | 6 | | (Enter on applicable line of your rtn) |
| Deductions | 7 Charitable contributions (attach schedule) SEE LINE 23 | 7 | 1,620 | Sch. A, line 15 or 16 |
| | 8 Section 179 expense deduction | 8 | 20,000 | See page 6 of the Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | 9 Deductions related to portfolio income (loss) (attach schedule) | 9 | | |
| | 10 Other deductions (attach schedule) | 10 | | |
| Investment Interest | 11a Interest expense on investment debts | 11a | | Form 4952, line 1 |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4f above | 11b(1) | 6,248 | See Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | (2) Investment expenses included on line 9 above | 11b(2) | | |
| Credits | 12a Credit for alcohol used as fuel | 12a | | Form 6478, line 10 |
| | b Low-income housing credit: | | | |
| | (1) From section 42(j)(5) partnerships for property placed in service before 1990 | 12b(1) | | Form 8586, line 5 |
| | (2) Other than on line 12b(1) for property placed in service before 1990 | 12b(2) | | |
| | (3) From section 42(j)(5) partnerships for property placed in service after 1989 | 12b(3) | | |
| | (4) Other than on line 12b(3) for property placed in service after 1989 | 12b(4) | | |
| | c Qualified rehabilitation expenditures related to rental real estate activities | 12c | | |
| | d Credits (other than credits shown on lines 12b and 12c) related to rental real estate activities | 12d | | See page 7 of the Shareholder's Instructions for Schedule K-1 (Form 1120S). |
| | e Credits related to other rental activities | 12e | | |
| | 13 Other credits | 13 | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 1120S.

Schedule K-1 (Form 1120S) 2000

KFA SHAREHOLDER 1

SF0US3 12/07/00

| | | (a) Pro rata share items | | (b) Amount | (c) Form 1040 filers enter amount in column (b) on: |
|---|---|---|---|---|---|
| Adjustments and Tax Preference Items | 14 a | Depreciation adjustment on property placed in service after 1986 | 14a | -10,154 | See page 7 of the Shareholder's Instructions for Schedule K-1 (Form 1120S) and Instructions for Form 6251. |
| | b | Adjusted gain or loss | 14b | | |
| | c | Depletion (other than oil and gas) | 14c | | |
| | d | (1) Gross income from oil, gas, or geothermal properties | 14d(1) | | |
| | | (2) Deductions allocable to oil, gas, or geothermal properties | 14d(2) | | |
| | e | Other adjustments and tax preference items (attach schedule) | 14e | | |
| Foreign Taxes | 15 a | Name of foreign country or U.S. possession ▶ | | | Form 1116, Part I |
| | b | Gross income sourced at shareholder level | 15b | | |
| | c | Foreign gross income sourced at corporate level: | | | |
| | | (1) Passive | 15c(1) | | |
| | | (2) Listed categories (attach schedule) | 15c(2) | | |
| | | (3) General limitation | 15c(3) | | |
| | d | Deductions allocated and apportioned at shareholder level: | | | |
| | | (1) Interest expense | 15d(1) | | |
| | | (2) Other | 15d(2) | | |
| | e | Deductions allocated and apportioned at corporate level to foreign source income: | | | |
| | | (1) Passive | 15e(1) | | |
| | | (2) Listed categories (attach schedule) | 15e(2) | | |
| | | (3) General limitation | 15e(3) | | |
| | f | Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 15f | | Form 1116, Part II |
| | g | Reduction in taxes available for credit and gross income from all sources (attach schedule) | 15g | | See Instructions for Form 1116 |
| Other | 16 | Section 59(e)(2) expenditures: a Type ▶ | | | See Shareholder's Instructions for Schedule K-1 (Form 1120S) |
| | b | Amount | 16b | | |
| | 17 | Tax-exempt interest income | 17 | | Form 1040, line 8b |
| | 18 | Other tax-exempt income | 18 | | See pages 7 and 8 of the Shareholders' Instructions for Schedule K-1 (Form 1120S). |
| | 19 | Nondeductible expenses | 19 | | |
| | 20 | Property distributions (including cash) other than dividend distributions reported to you on Form 1099-DIV | 20 | 16,388 | |
| | 21 | Amount of loan repayments for "Loans From Shareholders" | 21 | | |
| | 22 | Recapture of low-income housing credit: | | | |
| | a | From section 42(j)(5) partnerships | 22a | | Form 8611, line 8 |
| | b | Other than on line 22a | 22b | | |

23 Supplemental information required to be reported separately to each shareholder (attach additional schedules if more space is needed):

LINE 7
CHARITABLE CONTRIBUTIONS

CASH CONTRIBUTIONS - 50% LIMITATION ........................ $ 1,620
TOTAL $ 1,620

SHAREHOLDER 1 : WILLIAM W GRANTHAM 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

Form **4562**

Department of the Treasury
Internal Revenue Service (99)

# Depreciation and Amortization
## (Including Information on Listed Property)

▶ See separate instructions. ▶ Attach this form to your return.

OMB No. 1545-0172
2000
Attachment Sequence No. 67

Name(s) shown on return: INTERNATIONAL AIR RESPONSE, INC.
Identifying number: 86-0321772

Business or activity to which this form relates: FORM 1120S

**Part I** Election To Expense Certain Tangible Property (Section 179) Note: If you have any "listed property," complete Part V before you complete Part I.

| | | | |
|---|---|---|---|
| 1 | Maximum dollar limitation. If an enterprise zone business, see page 2 of the instructions | 1 | $20,000 |
| 2 | Total cost of section 179 property placed in service. See page 2 of the instructions | 2 | 26,635 |
| 3 | Threshold cost of section 179 property before reduction in limitation | 3 | $200,000 |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | 4 | 0 |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see page 2 of the instructions | 5 | 20,000 |

| 6 (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|
| 7-YEAR SHOP EQUIPMENT | 5,500 | 5,500 |
| 7-YEAR SHOP EQUIPMENT | 10,503 | 10,503 |
| 7-YEAR MANUALS | 2,265 | 2,265 |
| 7-YEAR MANUALS | 1,895 | 1,732 |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter amount from line 27 | 7 | 0 |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | 8 | 20,000 |
| 9 | Tentative deduction. Enter the smaller of line 5 or line 8 | 9 | 20,000 |
| 10 | Carryover of disallowed deduction from 1999. See page 3 of the instructions | 10 | 0 |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instructions) | 11 | 20,000 |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11. | 12 | 20,000 |
| 13 | Carryover of disallowed deduction to 2001. Add lines 9 and 10, less line 12 ▶ | 13 | 0 |

**Note:** Do not use Part II or Part III below for listed property (automobiles, certain other vehicles, cellular telephones, certain computers, or property used for entertainment, recreation, or amusement). Instead, use Part V for listed property.

**Part II** MACRS Depreciation for Assets Placed in Service Only During Your 2000 Tax Year (Do not include listed property.)

**Section A – General Asset Account Election**

14 If you are making the election under section 168(i)(4) to group any assets placed in service during the tax year into one or more general asset accounts, check this box. See page 3 of the instructions ▶ ☐

**Section B – General Depreciation System (GDS)** (See page 3 of the instructions.)

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 15a 3-year property | | | | | | |
| b 5-year property | | 6,472 | 5 | HY | 200DB | 1,295 |
| c 7-year property | | 163 | 7 | HY | 200DB | 23 |
| d 10-year property | | | | | | |
| e 15-year property | | | | | | |
| f 20-year property | | | | | | |
| g 25-year property | | | 25 yrs | | S/L | |
| h Residential rental property | | | 27.5 yrs | MM | S/L | |
| | | | 27.5 yrs | MM | S/L | |
| i Nonresidential real property | | | 39 yrs | MM | S/L | |
| | | | | MM | S/L | |

**Section C – Alternative Depreciation System (ADS):** (See page 5 of the instructions.)

| (a) Classification of property | (b) | (c) | (d) | (e) | (f) | (g) |
|---|---|---|---|---|---|---|
| 16a Class life | | | | | S/L | |
| b 12-year | | | 12 yrs | | S/L | |
| c 40-year | | | 40 yrs | MM | S/L | |

**Part III** Other Depreciation (Do not include listed property.) (See page 5 of the instructions.)

| | | | |
|---|---|---|---|
| 17 | GDS and ADS deductions for assets placed in service in tax years beginning before 2000 | 17 | 9,940 |
| 18 | Property subject to section 168(f)(1) election | 18 | |
| 19 | ACRS and other depreciation | 19 | 252 |

**Part IV** Summary (See page 6 of the instructions.)

| | | | |
|---|---|---|---|
| 20 | Listed property. Enter amount from line 26 | 20 | |
| 21 | **Total.** Add deductions from line 12, lines 15 and 16 in column (g), and lines 17 through 20. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instructions | 21 | 11,510 |
| 22 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | 22 | |

**STATEMENT 1**
**FORM 1120S, LINE 19**
**OTHER DEDUCTIONS**

| | |
|---|---|
| BANK CHARGES | $ 809 |
| DUES AND SUBSCRIPTIONS | 3,861 |
| FEES | 2,614 |
| INSURANCE | 85,885 |
| LEGAL AND PROFESSIONAL | 110,704 |
| MISCELLANEOUS | 1,577 |
| OUTSIDE SERVICES | 998 |
| POSTAGE | 718 |
| SUPPLIES | 66,890 |
| TELEPHONE | 14,206 |
| TRAINING AND EDUCATION | 290 |
| TRAVEL | 69,314 |
| UTILITIES | 5,556 |
| TOTAL | $ 363,422 |

**STATEMENT 2**
**FORM 1120S, SCHEDULE A, LINE 5**
**OTHER COSTS**

| | |
|---|---|
| CONTRACT LABOR | $ 125,479 |
| DEPRECIATION | 7,146 |
| FREIGHT | 13,679 |
| FUEL AND OIL | 428,340 |
| INSURANCE | 119,050 |
| LANDING FEES | 3,176 |
| LEASE EQUIPMENT | 1,241 |
| MAINTENANCE AND REPAIR | 62,951 |
| OTHER JOB COSTS | 29,888 |
| OUTSIDE SERVICES | 148,818 |
| PAYROLL TAXES | 36,148 |
| PER DIEM EXPENSES | 54,873 |
| SMALL TOOLS | 5,429 |
| SUPPLIES | 19,464 |
| TELEPHONE | 6,575 |
| UTILITIES | 1,474 |
| TOTAL | $ 1,063,731 |

**STATEMENT 3**
**FORM 1120S, SCHEDULE K, LINE 7**
**CHARITABLE CONTRIBUTIONS**

| | |
|---|---|
| CASH CONTRIBUTIONS - 50% LIMITATION | $ 1,620 |
| TOTAL | $ 1,620 |

**STATEMENT 4**
**FORM 1120S, SCHEDULE L, LINE 6**
**OTHER CURRENT ASSETS**

| | BEGINNING | ENDING |
|---|---|---|
| EMPLOYEE ADVANCES | $ 2,138 | $ 4,500 |
| MUTUAL FUNDS | 12,657 | 0 |
| NOTE RECEIVABLE | 20,000 | 20,000 |
| OTHER RECEIVABLES | 15,666 | 12,000 |
| TOTAL | $ 50,461 | $ 36,500 |

**STATEMENT 5**
**FORM 1120S, SCHEDULE L, LINE 14**
**OTHER ASSETS**

| | BEGINNING | ENDING |
|---|---|---|
| CSV LIFE INSURANCE | $ 0 | $ 12,657 |
| TOTAL | $ 0 | $ 12,657 |

**STATEMENT 6**
**FORM 1120S, SCHEDULE L, LINE 18**
**OTHER CURRENT LIABILITIES**

| | BEGINNING | ENDING |
|---|---|---|
| ADVANCES ON CONTRACT | $ 0 | $ 141,903 |
| CHARGE CARD PAYABLE | 2,106 | 0 |
| DEFERRED CASUALTY INCOME | 0 | 900,000 |
| P/R TAX AUDIT PAYABLE | 52,668 | 0 |
| PAYROLL TAXES PAYABLE | 48,948 | 0 |
| TOTAL | $ 103,722 | $ 1,041,903 |

**STATEMENT 7**
**FORM 1120S, SCHEDULE L, LINE 21**
**OTHER LIABILITIES**

| | BEGINNING | ENDING |
|---|---|---|
| NOTE PAYABLE - AFFILIATE | $ 17,500 | $ 0 |
| TOTAL | $ 17,500 | $ 0 |

**STATEMENT 8**
**FORM 1120S, SCHEDULE M-2, LINE 3**
**OTHER ADDITIONS**

| | |
|---|---|
| INTEREST INCOME | $ 6,248 |
| TOTAL | $ 6,248 |

**STATEMENT 9**
**FORM 1120S, SCHEDULE M-2, LINE 5**
**OTHER REDUCTIONS**

| | | |
|---|---|---|
| CONTRIBUTIONS | $ | 1,620 |
| SECTION 179 EXPENSE | | 20,000 |
| TOTAL | $ | 21,620 |

# EXHIBIT C

# DECLARATION OF WILLIAM W. GRANTHAM

I, William "Woody"Grantham, declare as follows:

1. I am over the age of 18 and am competent to make this declaration.

2. In 2000, IAR had approximately 25 employees, not all of which were full time and some of which were seasonal employees.

3. In 2000, IAR certainly had a net worth of less than $7,000,000. In fact, IAR's tax returns reveal that the company had negative equity around that time.

I declare under penalty of perjury that the foregoing is true and correct:

EXECUTED this 19th day of December 2007.

William W. Grantham

# EXHIBIT D

# In The Matter Of:

*International Air Response v.*
*The United States*

---

*William W. Grantham*
*April 4, 2005*

---

*Griffin and Associates Court Reporters*
*3030 North Central Avenue*
*Suite 1102*
*Phoenix, AZ USA 85012*
*(602) 264-2230 or (888) 529-9990*

*Original File WG040405.TXT, 36 Pages*
*Min-U-Script® File ID: 0107839162*

**Word Index included with this Min-U-Script®**

Page 25

DC-7 air tankers, two DC-7 freighters, and I think about two DC-7 sprayers. And then PB4Y2 and SC-119 and other various aircraft, but we owned as many as like 15 DC-7s at one time.

**Q:** Prior to this aircraft exchange, had T&G ever acquired aircraft directly from the federal government?

**A:** No, sir.

**Q:** Had T&G previously made any substantial purchases of equipment from the federal government?

**A:** No. No, sir.

**MR. HIPP:** Why don't we take a five-minute break, and I'll look at this other testimony that you identified for me.

(Recess taken from 10:44 a.m. to 10:50 a.m.)

**MR. HIPP:** Back on the record.

**Q:** (By Mr. Hipp) Do aircraft 117 and 118, do they have any other viable uses beyond the work that you're using them for for the military?

**A:** No, they don't.

**Q:** Do these aircraft, is there any civilian market for these aircraft?

**A:** Very, very limited. In fact, I would say nonexistent today due to, again, U.S. Forest Service's statements about the aircraft, their unknowledgeable statements about the aircraft.

**MR. PAPETTI:** You've probably qualified that

Page 26

enough times now.

**MR. HIPP:** I'll stipulate you don't agree with the Forest Service's —

**THE WITNESS:** Right.

**Q:** (By Mr. Hipp) Do C-130 aircraft, do you know of any recent sales by your competitors of C-130 aircraft?

**A:** No, I don't.

**Q:** Are they — if there were a resale market for these aircraft, would these be advertised? Let me put it this way. Strike my question, start over.

If I were theoretically looking to buy a C-130 aircraft, I mean, where would I look?

**A:** There's a publication called Trade-a-Plane that people list aircraft in, probably maybe on the Internet under some type of an aircraft sales heading, and word of mouth. There was an advertisement of one for sale a couple of months ago up at Hawkins & Powers Aviation in Wyoming by a lender that had loaned money on the aircraft. I understand there was a foreclosure sale. I don't know if it sold or if they ever got a bid on it or not.

**Q:** And where did you find out about that potential sale?

**A:** We were sent a flyer on it at the time. I believe it was about three months ago.

**Q:** All right. I'm going to ask you some questions

Page 27

about the financial picture at International Air, and I'll qualify that by saying that I'm just asking for your best good faith estimates. I understand that you don't have all of the company's financials in front of you, but we're just trying to get the best information we can onto the record for the purposes of making a settlement recommendation.

So, with that in mind now, your counsel previously provided me the income tax returns for International Air for 2001 and 2002. Do you know if the 2003 tax return's been completed?

**A:** I believe it has, but I'm not positive. It's on extension. It was — I have not talked to the accountants in the last week.

**Q:** Who are the accountants?

**A:** American Express Financial Services.

**Q:** How long have you been using them?

**A:** About one year.

**Q:** Who did you use previously, in the recent past?

**A:** A gentleman named Paul Peterson who was a private CPA.

**Q:** Where is he located?

**A:** Mesa, Arizona.

**Q:** About how many employees does International Air have right now?

**A:** Well, we're down to about six right now, six or

Page 28

seven.

**Q:** And basically speaking, what are those six people's positions or titles?

**A:** Well, the secretary, the maintenance — director of maintenance, and then the other people are basically maintenance personnel, maintenance — maintenance, combination of pilot and maintenance, combination flight engineers. They're dually qualified people, some of them.

**Q:** Okay. In 2002, you've listed gross receipts of approximately $3.4 million and in 2001 gross receipts of approximately $2.9 million. Do you know approximately what the gross receipts were for 2003?

**A:** A lot less. I'm not positive. I'd say probably half of that or something.

**Q:** And why the decline?

**A:** Because the U.S. Forest Service grounded the air tanker operations.

**Q:** Okay. And I should note this, but I don't. About when did that happen?

**A:** May the 11th of last year, 11th or 12th is when we were notified.

**MR. PAPETTI:** 2004 or 2003?

**THE WITNESS:** Last year, 2004.

**MR. PAPETTI:** I think he asked —

**MR. HIPP:** I have that in the file. I was just

Page 29

trying to get oriented here.
**MR. PAPETTI:** Okay.
**THE WITNESS:** I'm sorry.
**MR. HIPP:** I mean, that's obviously a record I can look up, but ...
**THE WITNESS:** Let me back up just a moment though. The financials is what Randy was getting to. The financials for 2003 would be somewhere probably in line with 2002 there because the big drop wouldn't take place until after we were grounded, which was 2004, just to clarify the whole thing. I was wrong.
**Q:** (By Mr. Hipp) Okay. So, the financial results for 2004 would show a big drop-off?
**A:** Yes, sir.
**Q:** Was International Air profitable in 2004?
**A:** Yes, it was as far as I know.
**Q:** Approximately how much profit?
**A:** Only a guess, somewhere in the neighborhood of maybe approximately $400,000.
**Q:** Was International Air profitable in 2003?
**A:** I'm sorry. See, let me back up just a minute.
**Q:** Sure.
**A:** I'm confused because what I gave you was an estimate for 2003. 2004 probably won't be near that because of the drop-off. It might even be a loss. Our year end is June

Page 30

30th of each year. That's why —
**Q:** Ah, okay. That will help clarify the confusion. Then if you could explain for me the compensation of officers and wages and why those numbers vary. Well, let me back up.
Who are the officers of International Air?
**A:** I am the only officer.
**Q:** And have you been the only officer since, say, 2000?
**A:** Yes, sir, I believe so.
**Q:** Okay. And how much do you pay yourself in your capacity as an officer?
**A:** 78,000 a year. I'm going to ask for a raise, too.
**Q:** Okay. And do you pay yourself any other kind of salary at International Air?
**A:** No.
**Q:** All right. So, your compensation from International Air is 78,000, and that's all you pay yourself as an officer and employee?
**A:** That's correct.
**Q:** Since 2000, have any of the officers or employees been members of your family?
**A:** My son is now working there, and he was working there at the time I believe or he started working there

Page 31

sometime after 2002. I don't remember the date.
**Q:** What's your son's name?
**A:** Travis, T-R-A-V-I-S, Grantham, G-R-A-N-T-H-A-M.
**Q:** And about how much is Travis paid?
**A:** Right now, he's paid approximately $4,000 per month.
**Q:** Are you the only shareholder of International Air now?
**A:** Yes, sir.
**Q:** Do you know what or how much International Air is worth currently from a balance sheet perspective?
**A:** Oh, I really couldn't tell you. I couldn't tell you what they're worth. I mean, not a whole lot because, of course, like our D1, DC-7 that we still operate, it's totally an air tanker. It's grounded by the U.S. Forest Service. And, of course, the C-130s only have the limited military usage. So not very much today.
**Q:** I should know this, but what does the Forest Service use to fight fires now?
**A:** Well, they're using more helicopters and what they call single engine air tankers, small crop duster type airplanes, and they're spending — after they grounded all of the large fixed wing air tankers last year, they went out and spent like 165 million additional dollars over and above the large air tanker budget in order to hire more helicopters and

Page 32

more single engine air tankers which were — single engine air tankers, they call it a seat, but what it is, it's a crop duster like you'd see spray in the field. Like, you know, the little yellow single engine airplanes you see flying around farmlands. You've probably seen them.
**MR. PAPETTI:** He's from Wichita. Maybe.
**MR. HIPP:** I've never seen the forest. Grass fires, yes, but never come close to a forest fire.
**THE WITNESS:** Like the little airplanes like they crop dust with, you know.
**Q:** (By Mr. Hipp) Okay. Mr. Grantham, I don't want to make an exhibit of the tax returns because there's no need for purpose getting so much confidential information into the record, but if I could just have you recite a few of the highlights so that they'll be in the transcript. Let me mark the categories here.
For 2002, what were the gross receipts?
**A:** 3,408,806.
**Q:** And what was the total income?
**A:** $1,027,599.
**Q:** What was officer compensation?
**A:** $78,000.
**Q:** And how much for salary and wages?
**A:** Well, it shows none for 2002. That can't be right.

Page 33

MR. PAPETTI: Well, I think it's less employment credit. It's how it got booked. Paid it all one year.

Q: (By Mr. Hipp) Okay. If we just read those categories for 2001, what was the gross receipts?

A: Gross receipts were $2,924,612.

Q: Total income?

A: $1,224,928.

Q: Officer compensation?

A: Zero.

Q: Did you not pay yourself that year?

A: I may not have. They only let me have money when they have money. So if the company's — I've always told Molly that if she's short on anybody, short me before she — so they may not have. There's been a lot of years that went by that I didn't get paid.

Q: Salary and wages for 2001?

A: 531,947.

Q: And for 2000, what were the gross receipts?

A: $2,681,267.

Q: The total income?

A: $981,344.

Q: Officer compensation?

A: I don't even see it on there. It must be in salaries. I don't see it on there.

Q: Okay. How much for salaries?

Page 34

A: 2000 was $107,000, 107,279.

MR. HIPP: All right. Let's go off the record for a second while I look at my notes.

(Recess taken from 11:09 a.m. to 11:12 a.m.)

MR. HIPP: Back on the record.

Q: (By Mr. Hipp) Where is Sergio Tomassoni today?

A: He passed away about two months ago.

MR. PAPETTI: I didn't know that.

THE WITNESS: Yeah, Sergio died about two months ago.

Q: (By Mr. Hipp) I'm sorry to hear that. Have you talked to Fred Fuchs in the recent past?

A: Approximately two years ago sometime.

Q: Where is Mr. Fuchs today?

A: As far as I know, he still lives in the Albuquerque, New Mexico, area.

Q: When was the last time you talked to Roy Reagan?

A: I haven't talked to Mr. Reagan for probably 10 years.

Q: Do you know where he is today?

A: Last I knew, he lived in the Phoenix area here.

MR. HIPP: All right. Let's go off the record again for a minute.

(Recess taken from 11:13 a.m. to 11:42 a.m.)

Page 35

(The deposition was concluded at 11:42 a.m.)

WILLIAM W. GRANTHAM

Page 36

STATE OF ARIZONA )

) ss.

COUNTY OF MARICOPA )

BE IT KNOWN, that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I, Kristin A: Woodall, RPR, a Certified Court Reporter, in the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to print by computer-aided transcription under my direction; that signature was requested; that the foregoing 35 pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED at Gilbert, Arizona, this 17th day of April, 2005.

KRISTIN A. WOODALL, RPR
Certified Court Reporter
Certificate No. 50196